**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM POND, | § | |
| (TDCJ-CID #1608119) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1300 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

Petitioner, William Pond, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a conviction in the 359th Judicial District Court of Montgomery County, Texas. Respondent filed an answer, which this court converts to a motion for summary judgment,[1] (Docket Entry No. 13), and copies of the state court record. Pond has filed his response. (Docket Entries Nos. 18 & 20). The threshold issue is whether Pond has presented meritorious grounds for federal habeas corpus relief.

### I.    Background

Pond was indicted for two counts of aggravated sexual assault of a child. He pled not guilty and requested a jury trial. The jury deadlocked on March 31, 2008 and the trial court declared a mistrial. (Docket Entry No. 6-11, p. 11). The State retried him. A jury found Pond guilty of the felony offense of aggravated sexual assault of a child. (Cause Numbers 06-04-3788I-CR and 06-04-

---

[1]The respondent relies on the state court record. In this Court's order entered on July 3, 2013, this Court stated that if matters outside the record were relied upon, the pleading should be titled as a motion for summary judgment.

3788II-CR). On October 12, 2009, the jury sentenced Pond to a sixty-year prison term on each count, to be served concurrently. The Ninth Court of Appeals of Texas affirmed Pond's conviction on June 15, 2011. *Pond v. State,* No. at 09-09-00483-CR, 2011 WL 2420828 (Tex. App. – Beaumont [9th Dist.] 2011, pet. ref'd)(not designated for publication). The Texas Court of Criminal Appeals refused Pond's petition for discretionary review on November 9, 2011. Pond filed an application for state habeas corpus relief on February 5, 2013, which the Texas Court of Criminal Appeals denied without written order, on findings of the trial court, without a hearing on May 1, 2013. (Docket Entry No. 6-40, *Ex parte Pond,* Application No. 79,267-01 at 2).

With the assistance of counsel, Pond filed this federal petition on May 3, 2013. Pond contends that his conviction is void for the following reasons:

(1)     The trial court violated Pond's due process and confrontation rights by excluding testimony that the complainant's mother encouraged her to make a sexual assault allegation against Pond;

(2)     Trial counsel, Stephen Jackson, rendered ineffective assistance by failing to:

    a.      file a motion in limine and object to opinion testimony that the complainant was credible;

    b.      object to inadmissible opinion testimony that Pond used fear and intimidation to keep the complainant quiet;

    c.      object to the court's improper comment on the weight of the evidence;

    d.      file a motion in limine and object to a witness referring to the complainant as the victim; and

e.     call the complainant's brother as a witness to testify that his mother told him that Pond had sexually abused him; and

(3)    Appellate counsel, Judith Shields, rendered ineffective assistance by failing to:

    a.     brief the issue that the trial court erred in allowing the prosecutor to use argument and inflammatory language towards Pond during cross-examination; and

    b.     brief the issue that the trial court allowed a witness to testify for the State about the national problem of child sex crimes.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, p. 8).

## II.    The Applicable Legal Standards

This Court reviews Pond's petition for writ of habeas corpus under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an adjudication on the merits. An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).  A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached

by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000). A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495. Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman,* 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke,* 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia,* 454 F.3d at 444-45 (citing *Summers v. Dretke,* 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that,

in a summary judgment proceeding, all disputed facts must be construed in the light most favorable

to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear

and convincing evidence" as to the state court's findings of fact, those findings must be accepted as

correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

## III.    Statement of Facts

The Ninth Court of Appeals summarized the evidence at trial as follows:

> On February 26, 2006, officers with the Montgomery County
> Sheriff's Department responded to a 9–1–1 call by Toni Pain alleging
> a sexual assault. When Officer Gerald Bruce arrived at the scene Pain
> was "upset" and told him that she had arrived home from the store
> and found her husband, Pond, on top of her young daughter. Pain told
> Bruce that they were under a blanket and that Pond got up "fixing his
> pants" and went into the bathroom. Pain told Bruce that her daughter,
> A.P., who was eight years old at the time of the alleged assault,
> "pulled up her underwear and her pants." Pain further told Bruce that
> when Pain confronted Pond he admitted that he had been sexually
> assaulting A.P. "for six months."
>
> Bruce testified that Pain indicated that Pond had fled the residence
> when she called the police. A.P. was not at the residence when Bruce
> arrived and he advised Pain that A.P. needed to be brought back to
> the residence. Police gathered evidence at the scene including the
> blanket that A.P. and Pond had been under, the pants Pond was
> wearing at the time of the assault, and the shorts and panties A.P. was
> wearing at the time of the assault. Police were unable to locate Pond.
> After speaking with the responding officers, Pain took A.P. to the
> hospital to be examined.
>
> At the time of trial, A.P. was twelve years old. A.P. testified that on
> February 26, 2006, she was eight years old. A.P. stated that she did
> not recall how old she was the first time that her stepfather sexually
> assaulted her. A.P. testified that Pond touched her privates "with his
> private." She further testified that Pond touched the inside of her
> bottom with his private. A.P. did not tell her mom because she was
> scared. A.P. stated that the first time Pond assaulted her he told her
> not to tell anyone. A.P. explained that the assaults happened "a lot"
> at the "old house." A.P. also stated that at some point the abuse

started happening again after they moved to the trailer on Fire Tower Road. A.P. told the jury that the assaults occurred in her room, her mom's room, and on the couch in the living room. A.P. explained that Pond would sometimes call her into her parents' bedroom and assault her. She further stated that sometimes he would get into the bed she shared with her little sister, take off his pants, take her shorts off, and put his private in her bottom. On some of these occasions Pond would fall asleep in her bed. A.P. further stated that the assaults happened "a lot" on the couch.

A.P. testified that on the day her mom walked in while Pond was assaulting her, Pond had called her over to the couch to come lay down with him, pulled her pants down, and "did the same thing he'd been doing." When asked if this meant, "the same thing that he did ... with his private in your private?" A.P. responded, "Yes, sir." A.P. stated that her siblings were either outside or in their rooms during the assault. A.P. testified that she and Pond were under a blanket and Pond had his pants off. A.P. explained that she was lying on the couch facing "up" when her mother walked in the back door and that she and Pond were both facing the kitchen. A.P. stated that when her mom walked in, Pond had his private in her bottom and he "jumped up and ran to [her mom's] room." A.P. stated that she was "pulling up [her] pants" when Pond ran to the bedroom. When Pain asked A.P. what was going on, she said "nothing" because she did not know what to say. A.P. stated that her mom went into the bedroom and began yelling at Pond. Thereafter, Pain told A.P. and her siblings they were leaving. Prior to leaving, Pain called all the kids into the bedroom to tell Pond goodbye. A.P. stated that Pond whispered into her ear that he was sorry and "don't let anyone do that to [her] ever again." Thereafter, Pain took A.P. and her siblings to Coldspring to Theresa and Leonard Pond's house. The testimony established that the man A.P. refers to as "Uncle Leonard" is Pond's cousin. For ease of reference we will refer to him as Uncle Leonard. A.P. testified that later that day her Uncle Leonard drove her back to her house.

Theresa Pond also testified at trial. Theresa testified that she was married to Leonard, Pond's cousin. Theresa testified that Pain called her "upset" and told her that she walked through her back door and "caught [Pond] and [A.P.] on the couch," and Pond "jumped up and ran to the bathroom" and "[A.P.] got up and pulled her pants up[.]" Pain brought the children to Theresa and Leonard's house in Coldspring. At some point Pain went back to the family's trailer in Conroe. Thereafter, Pain called the police. Theresa testified that she

and Leonard drove the children back to Conroe. Theresa stated that she accompanied Pain and A.P. to the hospital and Leonard drove the other children back to Coldspring. Pain and her children stayed with Theresa and Leonard for about two weeks and then went to Alabama where they stayed with Pain's family for roughly three months.

Pain also testified at trial. Pain testified that A.P. was born in March 1997 and she started dating Pond in May 1997. Pain and Pond were married in October 2004. Pain had two children, J.P. and A.P., prior to marrying Pond, and Pain and Pond had two children together. At the time of trial, Pain and Pond were divorced, purportedly as a result of the February 26 incident. Pain testified that in December 2002 they moved to the trailer on Fire Tower Road in Conroe. According to Pain, Pond would lay down with A.P. under a blanket. Pain further testified that Pond would go lay down with the girls at night to "put them to sleep." Pain told the jury that after lying down with the girls, Pond would often want to have sex with her. If she refused, he would watch porn and masturbate.

In November 2005, Pond was diagnosed with testicular cancer. At the time of the alleged assault on February 26, Pond had been home from the hospital for about a week. Pain testified that Pond was still able to have sex. Pain stated that on February 26 she walked through the back door of their trailer and saw A.P. jump up from the couch and when she got into the kitchen A.P. appeared to have "just pulled her shorts up." According to Pain, Pond ducked down and ran in front of the kitchen bar to the bathroom in the master bedroom. Pain stated that Pond's shirt was off. Pain testified that she asked A.P. what was going on and she said, "Nothing." Pain told A.P. to go to her room and then Pain went into the bedroom to confront Pond. Pain explained that she met Pond as he was coming out of the master bathroom and the "look on his face" was "like he just got caught doing something." Pain testified that she started screaming because she knew what had happened "by the look on his face." According to Pain, Pond did not deny sexually assaulting A.P. Pain stated that Pond admitted he had been having sex with A.P. "for six months." According to Pain, Pond was crying and said he was sorry. Pain testified that Pond said "he was going to take the shotgun and go out back and shoot himself."

Pain stated that for "an hour or two" she alternated between talking to A.P., who was in her bedroom, and talking to Pond, who was in the master bedroom. Pain testified that A.P. told her that Pond put "his

> private part ... in her bottom." Pain told the kids they were leaving and took them to Coldspring. At some point thereafter, Pain returned to their trailer in Conroe and called the police. Pain stated that when she called the cops Pond "looked scared" and "took off into the woods across the street." Pond eventually turned himself in to the police.
>
> The jury convicted Pond of two counts of aggravated sexual assault and sentenced him to sixty years confinement on each count.

*Pond v. State,* No. 09-09-00483-CR, 2011 WL 2420828 (Tex. App. – Beaumont [9th Dist.] 2011, pet. ref'd)(not designated for publication).

## IV. The Issue of Exhaustion

Respondent argues that Pond has not exhausted state court remedies as to claim 1. (Docket Entry No. 13, p. 7). Under the AEDPA, a habeas application by a person in custody under a state-court judgment may not be granted unless: "(A) the applicant has exhausted the remedies available in the courts of the State; or (B) (i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1) (West 2017).

A state prisoner must exhaust his remedies in state court before a federal court may grant habeas relief. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842 (1999). State prisoners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," to give the state courts "a full and fair opportunity" to resolve any federal constitutional claims. *Id.* "This requirement is not jurisdictional, but 'reflects a policy of federal-state comity.'" *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir. 2003) (quoting *Wilder v. Cockrell,* 274 F.3d 255, 260 (5th Cir. 2001)).

To satisfy the exhaustion requirement, a claim must be presented to the highest available state court for review. *Rocha v. Thaler*, 626 F.3d 815, 820 (5th Cir. 2010); *Kittelson v. Dretke*, 426 F.3d 306, 315–16 (5th Cir. 2005). The Texas Court of Criminal Appeals "is the highest court in Texas state court for purposes of exhaustion of state court remedies." *Tipton v. Thaler*, 354 F. App'x 138, 140 n.1 (5th Cir. 2009); *see also Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). To allow the State the opportunity to review and if needed to correct alleged violations of its prisoners' federal rights, all grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" in the state court before the federal courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The state court must have been presented with the same facts and legal theory on which the petitioner bases his current federal-court assertions. *Ruiz v. Quarterman*, 460 F.3d 638 (5th Cir. 2006). Finally, the petitioner must have done so in a procedurally correct manner. *Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Rauchle v. Barton*, 37 F.3d 629 (5th Cir. 1994).

Respondent argues that claim 1 is unexhausted and procedurally barred from proceeding in this federal habeas corpus petition because the state court to which Pond would be required to present his unexhausted claims would now find those claims procedurally barred. *See Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (an unexhausted claim that would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition is procedurally barred). However, 28 U.S.C. § 2254(b)(2) provides that "(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Notwithstanding Pond's failure to exhaust the remedies available in the courts of the State, this Court may proceed to deny relief on the merits of his

unexhausted claims. *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005); *Mercadel v. Cain*, 179 F.3d 271, 276–78 (5th Cir. 1999).

This Court will review the merits of Pond's unexhausted claim based on trial court error.

## V.     The Claim of Trial Court Error

### (Ground 1)

Pond states that after the Defense rested, the State sought to introduce the testimony of J.P., the complainant's brother, to testify in rebuttal that he was sexually assaulted by Pond. 8 R.R. 26, 243; 11 R.R. 23-36[2]. The trial court conducted a hearing outside the presence of the jury to determine the admissibility of his testimony. 11 R.R. 23-24. J.P. testified that he did not remember being sexually assaulted, but that Pain "reminded" him after the first trial that Pond had sexually assaulted him. 11 R.R. 33-34. Thereafter, the State withdrew its request to admit the testimony. 11 R.R. 36. Pond requested to re-open the defense case to call J.P. to testify that his mother reminded him that he had been sexually assaulted by Pond. 11 R.R. 36-38. Counsel argued that testimony regarding Pain's instructions to J.P. corroborated the main theory of the Defense—that Pain made the complainant believe that Pond sexually assaulted her. The court ruled that the testimony was not relevant because it had "nothing to do with [the complainant]." 11 R.R. 38-37, 41-42.

Pond argues that the State's case depended on the credibility of Pain and the complainant. Excluding this testimony left the jury with the impression that there was no direct evidence to corroborate the Defense's assertion that Pain encouraged the complainant to make the sexual assault allegations against Pond. J.P.'s testimony corroborated this defense. Pond maintains that J.P.'s testimony regarding Pain's instructions would have enabled the jury to understand the complainant's

---

[2]All citations to the Reporter's Record or "RR" refer to Docket Entries Nos. 6-15 to 6-38.

motive to falsely accuse Pond. Pond insists that the exclusion of this testimony denied Pond his Sixth Amendment right to confrontation and his Fourteenth Amendment due process right to a fair trial.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006) (internal quotation marks omitted). "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *United States v. Scheffer,* 523 U.S. 303, 308 (1998)). Per that constitutional guarantee, the Supreme Court in *Crane v. Kentucky* held that the state court erred in excluding "competent, reliable evidence bearing on the credibility of [the defendant's] confession" merely because the trial court had ruled the confession voluntary. 476 U.S. 683, 690 (1986); *see id.* at 690–91 ("Th[e] opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (internal quotation marks omitted)); *see also Chambers v. Mississippi,* 410 U.S. 284, 302 (1973) ("The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."); *Washington v. Texas,* 388 U.S. 14, 23 (1967) ("We hold that the petitioner in this case was denied

his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.").

A "trial court is afforded wide discretion in assessing the relevance and prejudicial effect of evidence." *United States v. Seale,* 600 F.3d 473, 494 (5th Cir. 2010) (citation omitted). Therefore it has the power to exclude, *inter alia,* witness "testimony that would be cumulative and marginally relevant." *See United States v. Wallace,* 32 F.3d 921, 929 (5th Cir. 1994). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Ragsdale,* 426 F.3d 765, 774 (5th Cir. 2005) (citation and internal quotation marks omitted).

This Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Powers,* 168 F.3d 741, 748 (5th Cir. 1999). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Dawson v. United States,* 68 F.3d 886, 896 (5th Cir. 1995) (quoting *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir. 1995)). Even if the court abused its discretion, reversal is required only if the evidentiary error affected the substantial rights of the parties. Fed. R. Evid. 103(a). "An error is harmless if the court is certain, after reviewing the record, that the error did not influence the jury or had only a slight effect on its verdict." *Tanner v. Westbrook,* 174 F.3d 542, 549 (5th Cir. 1999) (citing *EEOC v. Manville Sales Corp.,* 27 F.3d 1089, 1094 (5th Cir. 1994)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The trial judge has broad discretion over determinations of relevance and unfair prejudice. *United States v. Madera,* 574 F.2d 1320, 1322 (5th Cir. 1978). But Rule 403 should be used sparingly to exclude relevant evidence. *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).

Although an accused has a Sixth Amendment right to offer testimony and to question witnesses, the right to a vigorous defense is limited by the Federal Rules of Evidence. *Taylor v. Illinois,* 484 U.S. 400, 410–11 (1988) ("The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case."). Due process and the Sixth Amendment's Compulsory Process Clauses entitle a defendant to obtain witnesses in his favor and present exculpatory evidence, but a defendant's rights are abridged only when the defendant is precluded from presenting testimony or witnesses that are relevant and material to the defense. *See Washington v. Texas,* 388 U.S. 14, 23 (1967); *see also Taylor,* 484 U.S. at 408. Accordingly, although Pond phrases his argument in terms of the Sixth Amendment, the question is whether the court abused its discretion by excluding evidence as unfairly prejudicial.

Pond wished to introduce J.P.'s testimony to show that J.P.'s mother, Pain, had reminded him of being abused by Pond. Pond sought to show that A.P. was similarly coerced by Pain to make false allegations of sexual abuse against Pond.

Pond raised this issue on appeal, and the Texas Court of Criminal Appeals subsequently refused Pond's petition for discretionary review. "When one reasoned state court decision rejects a federal claim, subsequent unexplained orders upholding that judgment or rejecting the same claim are considered to rest on the same ground as did the reasoned state judgment." *Bledsue v. Johnson,* 188 F.3d 250, 256 (5th Cir. 1999). This "look through" doctrine enables a federal habeas court "to ignore—and hence, look through—an unexplained state court denial and evaluate the last reasoned state court decision." *Id.; see also Renz v. Scott,* 28 F.3d 431, 432 (5th Cir. 1994) (finding that the denial of relief "on the findings of the trial court" by the Texas Court of Criminal Appeals adopts an express finding by the trial court that a claim was procedurally barred from habeas review); *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

In this case, the Ninth Court of Appeals rejected Pond's trial court error claim. Because the Ninth Court of Appeals issued the last reasoned opinion on this matter, this Court "looks through" the Texas Court of Criminal Appeals' order to the appellate court's decision.

The Ninth Court of Appeals found:

> MOTION TO REOPEN
> In issues eight and nine, Pond argues that the trial court erred in denying his request to reopen evidence and introduce testimony from J.P., A.P.'s brother, and that the trial court abused its discretion in finding J.P. incompetent to testify at trial. After the State and Pond

rested, the State presented a bill of review regarding the testimony of J.P., which the State sought to introduce in rebuttal as an extraneous sexual assault committed by Pond.

At the time of trial, J.P. was thirteen years old. J.P. explained that he understood the difference between the truth and a lie. J.P. testified that prior to the family going to Alabama, Pond had touched him "[i]n the private area." J.P. stated that Pond touched him "in the front," "[q]uite a few times." J.P. explained that the touching was on the outside of his pants and that he was always clothed during the assaults. J.P. stated that he did not recall how old he was when the inappropriate touching occurred but that it made him uncomfortable. J.P. stated that he did not tell his mother. J.P. explained that he had testified in Pond's first trial but that nobody ever asked him if anything like this had happened to him. Pond was initially tried for the charged offense in March 2008. However, Pond's first trial resulted in a hung jury. In addressing motions in limine, counsel for both parties agreed that no reference would be made in the underlying proceeding to the first trial of this cause. To the extent necessary, the first trial was referenced only as an earlier proceeding or hearing. J.P. explained that he did not tell anyone that Pond had inappropriately touched him during the first trial because he was nervous. J.P. stated that he eventually told his mother about the assaults. When defense counsel questioned J.P., he stated that he did not remember when he first told his mother about the assaults but that it was when he was living in the trailer on Fire Tower Road. J.P. explained that following the February 26 incident, his mother questioned him and his siblings about whether Pond had touched them inappropriately, and he told her "no."

Defense counsel elicited the following testimony from J.P. regarding when he first told his mother about the assaults:

[Counsel:] And when was the first time you made mention of this to anybody?

[J.P.:] When my mom told me that he did—said he did it back in jail.

[Counsel:] Okay.

[J.P.:] They had him on TV.

[Counsel:] . . . So, this would have been . . . kind of a long time ago when he was in jail when he was on TV, right? Yes?

[J.P.:] Yes.

[Counsel:] That's when you first told your mom about it, right?

[J.P.:] Yes.

Thereafter, the following exchange took place on the record:

THE COURT: [J.P.], were you just telling [defense counsel] that you told your mom before that first hearing, that first big hearing in the other building?

[J.P.:] No. I told her after that.

THE COURT: That's what I thought.
. . .
[Counsel:] You told her shortly thereafter?

[J.P.:] Yes.
. . .
THE COURT: . . . So, before the first trial with Mr. Pond, you had not told your mom?

[J.P.:] No.
. . .
[Counsel:] And so, you remember—if he was on T.V., it was when he first got arrested, do you recall that?

[J.P.:] No. But my mom told me that when I went up there.

[Counsel:] . . . what did your mom tell you? Did she tell you the first hearing didn't go the way she wanted it or—

[J.P.:] She told me that she[sic] had did it to me and [A.P], but I don't remember.

[Counsel:] Okay. So, your mom told you that this happened to you and [A.P.], but you didn't remember?

[J.P.:] Yes.

[Counsel:] So, she refreshed your memory and helped you remember it?

[J.P.:] Yeah.

. . .

THE COURT: Did you remember first and tell your mom?

[J.P.:] No.

THE COURT: Your mother knew that—

[J.P.:] My mom told me. And I started to think about it, and I remembered.

[Counsel:] Judge, we have no objection to the admission of his testimony. In fact, we want the jury to hear it.

The State further questioned J.P. as follows:

[State:] Do you remember this happening to you?

[J.P.:] No. I remember it, but I don't remember what day it was.

[State:] Okay. Tell us what you remember? What you remember. Not what your mom told you, [J.P.], what you remember?

[J.P.:] That he was touching me inappropriately.

[State:] And where was he touching you?

[J.P.:] In the private area.

[State:] Okay. Now, are you here based upon something that your mom told you or based upon what you remember?

[J.P.:] What I remember.

The State stated that it did not wish to call J.P. to testify. Defense counsel made a motion to reopen its case in order to call J.P. as a witness. Defense counsel argued that the testimony of J.P. supported the defensive theory that Pain had coached A.P. to say that Pond had sexually assaulted her. The trial court concluded that it could not find beyond a reasonable doubt that Pond had committed the extraneous

offense and excluded the evidence. The trial court denied Pond's request to reopen. The following day, Pond presented a bill of review regarding J.P.'s potential trial testimony. Pond argued he should be allowed to reopen his case pursuant to article 36.02 of the Code of Criminal Procedure to call J.P. as a witness. The trial court denied this request and concluded that J.P. was incompetent to testify under Rule 601 of the Rules of Evidence and the factors enumerated in *Reyna v. State,* 797 S.W.2d 189, 191–92 (Tex. App. - Corpus Christi 1990, no pet.).

We review a trial court's denial of a request to reopen the evidence under an abuse of discretion standard. *Reeves v. State,* 113 S.W.3d 791, 794 (Tex. App. - Dallas 2003, no pet.) (citing *Peek v. State,* 106 S.W.3d 72, 79 (Tex. Crim. App. 2003)). A trial court must allow the introduction of evidence at any time before the conclusion of argument if it appears necessary to the due administration of justice. Tex. Code Crim. Proc. Ann. art. 36.02 (West 2007). " '[D]ue administration of justice' means a judge should reopen the case if the evidence would materially change the case in the proponent's favor." *Peek,* 106 S.W.3d at 79. To establish a material change, the proponent of the evidence must show that the evidence is more than "just relevant—it must actually make a difference in the case." *Id.* Among the factors to consider in determining the materiality of the evidence under article 36.02 are the weight of the evidence, its probative value, the issue upon which it is offered, and whether it is cumulative. *See id.* at 77–79.

In the present case, the State concedes that because J.P. was present and ready to testify and the substance of his testimony was apparent at the conclusion of the hearing, the only question is whether the trial court abused its discretion in determining that J.P.'s testimony was not necessary to the due administration of justice. *See generally Reeves,* 113 S.W.3d at 795. We are not persuaded that J.P.'s testimony would have materially changed the case in Pond's favor. Pond testified at trial that Pain manipulated or coached A.P. to make the allegations against him because Pain believed Pond was cheating on her. In addition, Pond's cousin Leonard testified that A.P. told him that Pond was going to go to jail for "something he didn't do." The jury heard testimony regarding Pond's theory that Pain was behind the allegations, as well as his testimony regarding the events of February 26. The jury also heard testimony from A.P., Pain, Theresa, Goodwin, and law enforcement personnel regarding the events of February 26. J.P.'s testimony regarding how he came to recall that he

had been touched inappropriately centered on a conversation J.P. had with his mother after Pond's first trial, well after the February 26 incident of A.P. Moreover, J.P. testified that his testimony was based on what he remembered and not what his mother told him. On this record, we cannot conclude that J.P.'s testimony would have materially changed the case in Pond's favor.

We hold the trial court did not abuse its discretion in denying Pond's motion to reopen evidence to introduce the testimony of J.P. We overrule issue eight. Because we overrule issue eight, we need not address the merits of issue nine. Having overruled the issues raised on appeal, we affirm the judgments of the trial court.

*Pond v. State,* No. 09-09-00483-CR, 2011 WL 2420828, at *11-13 (Tex. App. – Beaumont [9th Dist.] 2011, pet. ref'd)(not designated for publication).

Pond has not shown how exclusion of J.P.'s testimony had a substantial and injurious effect or influence in determining the jury's verdict. The jury heard testimony that the complainant's mother manipulated or coached the complainant to make the allegations against him. Leonard Pond testified that A.P.'s mother brought her and her siblings to his house on the day of the incident and A.P. came to him, upset, "that her daddy is going to jail for something he didn't do." 8 RR 180.

Regarding A.P.'s allegations, Pond testified on direct examination as follows:

> MR. JACKSON: Thank you.
> Q.    (BY MR. JACKSON) William, are [A.P.]'s statements true or untrue?
> A.    Her statements are untrue.
> Q.    Do you have any idea why she would make those statements?
> A.    Because her mom made her
> Q.    That's your belief?
> A.    That is my belief.
> Q.    And without going into it, do you have an opinion as to why her mom made her make up these statements?
> MR. FREYER: Calls for speculation. Calls for speculation.
> MR. JACKSON: Your Honor, I'll ask the question differently.
> THE COURT: Thank you. Sustained.

Q. (BY MR. JACKSON) Okay. It's your belief -- okay. How does it make you feel to hear those allegations?

A. It angers me.

THE COURT REPORTER: I'm sorry.

THE WITNESS: I said it angers me.

Q. (BY MR. JACKSON) Did you ever touch [A.P.] inappropriately --

A. I have never.

Q. -- with any part of your body?

A. I have never touched [A.P.] inappropriately.

Q. And so when the testimony has it that this could have happened 500 to 800 times, it happened weekly for the past -- since she was five, is there any portion of that that has any remoteness of being true?

A. That is not true.

8 R.R. 121-22.

Regarding events on February 26, 2006, Fond testified:

Q. So, she -- she being, Toni, your wife, she wakes you up and tells you what?

A. She tells me she's going to get some cigarettes.

Q. And does she also tell you she's going to go to McDonalds and the Red Box?

A. I do not recall her saying she's going to McDonalds.

Q. If she was going to get cigarettes, would you have an idea of the approximate drive time there and back as to where she would typically go get cigarettes?

A. Yes.

Q. And so when she says it could be about 38 miles round trip to that area, saying 45 minutes or so, would that be a reasonable time consumption to make that trip?

A. If she was just going to get cigarettes or --

Q. Uh-huh -- or would that even be too long?

A. Maybe 30 minutes.

Q. So, if she told you that, then you would have an idea of how long she would be driving to and from?

MR. FREYER: He's leading his witness, and I respectfully object.

MR. JACKSON: I'll ask it differently, Judge.

THE COURT: Okay. Sustained.

Q. (BY MR. JACKSON) Would you have an idea how long it would take her to go there and back?

A. Yes, I would.

Q. How long did you live in that area?

A. Six years.

Q. And did you travel frequently in a vehicle in that area?

A. I did.

Q. And did you know where she would typically get cigarettes?

A. Yes.

Q. Okay. And so, when she told you that, did you have an idea how long it would take her to return?

A. Yes.

Q. Would Toni typically enter and exit the house through the back door?

A. She would come into the back.

Q. And can you hear the vehicle when it drives up in the trailer?

A. You can.

Q. Can you hear the slamming or the shutting of a car door outside the house from inside the mobile home?

A. You would be able to.

Q. When Toni gets home, where were you?

A. I was in the bathroom.

Q. What do you recall happening when she - she got home?

A. I was in the restroom. I see her pull up. She gets out. There's a few minutes. She comes into the restroom. She starts hollering at me that I have been cheating on her.

Q. Hang on a second. You saw her come in. How did you see her come in?

A. There's a window right in front of our toilet and we always park right in front of this window.

Q. Okay. So, she comes into the bathroom area and says what?

A. She just starts hollering at me that I've been cheating on her and begins to hit me.

Q. Okay. She tell you why you have been cheating on her or why she believes that?

A. Because she had found there was a condom missing.

Q. Okay. And how angry was she?

A. She was angry.

Q. Was she hitting?

A. Yes. She was hitting me in the arm.

Q. Yelling?

A. She was.

Q. Was she screaming?

A. She was.

Q. Was it loud?

A.    It was loud.

8 R.R. 123-26.

The appellate court determined that J.P.'s testimony was cumulative of other testimony at trial.  In reviewing Pond's claim that J.P.'s testimony was improperly excluded, the appellate court found that Pond testified at trial that Pain manipulated or coached A.P. to make the allegations against him because Pain believed Pond was cheating on her.  Pond's cousin, Leonard, also testified that A.P. told him that Pond was going to go to jail for something 'he didn't do.'  The jury also heard testimony from A.P., Pain, A.P.'s aunt, and law enforcement personnel regarding the events of February 26.  The appellate court noted that J.P.'s testimony regarding how he came to recall that he had been touched inappropriately centered on a conversation J.P. had with his mother after Pond's first trial, well after the February 26, incident of A.P.  J.P. testified that his testimony was based on what he remembered and not on what his mother told him.  The appellate court determined that J.P.'s testimony would not have materially changed the case in Pond's favor.  Because the same information was introduced through Pond and his cousin, Leonard Pond, testimony as would have been introduced by the admission of J.P.'s testimony, the district court did not abuse its discretion in excluding this evidence as cumulative.  *Winans v. Rockwell Int'l. Corp.,* 705 F.2d 1449, 1456 (5th Cir. 1983) (finding that it was harmless to exclude documentary evidence that was cumulative to direct testimony).

Had J.P. been allowed to testify, he would have relayed that Pond touched him inappropriately in the front, over his clothes long before the incident with A.P. 11 RR 27, 29-30. Pond was charged with sexually assaulting A.P. by penetrating her vaginally and anally.  Observing that the situation that occurred with J.P. was far different than the allegations against him with regard

to A.P., the trial court reasoned, "if this had to do with the instant offense, with [A.P.]'s, then it would be different." 11 RR 38. The trial court then explained that admitting the testimony would lead to unfair prejudice and mislead the jurors, confusing the issues." 11 RR 40. The incident J.P. would have testified to occurred a long time ago, when he was in third grade (he was thirteen and in the eighth grade at the time of his testimony) and he did not tell his mother until long after the February 26 incident for which Pond was on trial. 11 RR 33-35. Moreover, J.P. never specifically stated that he was coached or that his mother helped him remember. He testified that the inappropriate touching incidents were based on what he remembered, not what his mother told him. 11 RR 35. In a hearing outside the jury's presence, when the State sought to introduce J.P.'s testimony, the prosecutor noted that it came out at the last trial that Pond showed J.P. pornography. 8 RR 133. The prosecutor provided notice of his intent to show that Pond showed J.P. pornography. 8 RR 138. The jury would have heard that Pond inappropriately touched A.P.'s brother on several occasions and showed him pornography. J.P.'s testimony would have undermined the Defense theory that he was coached and, by reasonable extrapolation, A.P. was also coached to make false allegations of sexual abuse against Pond.

Pond argues that the trial court erred in excluding J.P.'s testimony. However, the trial court also determined that J.P. was incompetent to testify under Rule 601 of the Rules of Evidence. Texas Rule of Evidence 601(a)(2) places the power to determine a witness' competency into the hands of the trial judge. *Broussard v. State,* 910 S.W.2d 952, 960 (Tex. Crim. App. 1995), *cert. denied,* 519 U.S. 826 (1996). The standard for reviewing a trial court's determination of whether a child witness was competent to testify is abuse of discretion. *See Baldit v. State*, 522 S.W.3d 753, 761 (Tex. App.—Houston [1st Dist.] 2017, no pet.). This means the defendant would have to show from the

record that the trial court abused its discretion in implicitly finding the complainant was competent to testify. *See Moore*, 395 S.W.3d at 158; *Baldit*, 522 S.W.3d at 761. Pond, however, has made no such showing. Generally, every person is presumed competent to testify. *See* Tex. R. Evid. 601(a); *Baldit*, 522 S.W.3d at 761; *Hogan v. State*, 440 S.W.3d 211, 213 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). A child or any other person is not competent to testify if, after examination by the court, the court finds the person "lacks sufficient intellect to testify concerning the matters in issue." Tex. R. Evid. 601(a)(2). A trial court is not required to conduct a sua sponte preliminary competency examination of a child witness. *Baldit*, 522 S.W.3d at 761. Instead, the party seeking to exclude the witness must raise the issue. *Id.* When a party challenges the competency of a child witness, the court will consider whether the witness possesses (1) the ability to intelligently observe the events in question at the time of the occurrence, (2) the capacity to recollect the events, and (3) the capacity to narrate the events. *Id. See also Hogan*, 440 S.W.3d at 213–14. The third element involves the ability to understand the moral responsibility to tell the truth, to understand the questions posed, and to frame intelligent answers. *Baldit*, 522 S.W.3d at 761. A child witness need not understand the obligation of the oath, but the trial court must impress the child with the duty to be truthful. *Id.* There is no precise age under which a child is deemed incompetent to testify. *Id.* Moreover, "[i]f a person afflicted with a physical or mental disability possesses sufficient intelligence to receive correct impressions of events he sees, retains clear recollection of them and is able to communicate them through some means there is no reason for rejecting his testimony." *Watson v. State*, 596 S.W.2d 867, 870–71 (Tex. Crim. App. [Panel Op.] 1980); *see also Hogan*, 440 S.W.3d at 214. Inconsistencies in a child's testimony, while probative on the issue of competency, do not alone render the child incompetent. *Fields v. State*, 500 S.W.2d 500, 503 (Tex. Crim. App. 1973). The role

of a federal habeas court is to "'guard against extreme malfunctions in the state criminal justice systems,'" *Richter*, 562 U.S. at 102–103 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)), not to apply *de novo* review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge. A state court's findings and conclusions on questions of fact are entitled to deference unless the petitioner shows that they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008). Moreover, a state court's findings of fact are presumed to be correct on federal habeas review, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted).

In this case, the trial court's determination that J.P. was not competent was based on her personal observation of J.P. as he answered questions during the hearing. The trial court explained:

> THE COURT: Okay. Under 601, it -- it starts a whole lot sooner with Mr. Justin. I do not find him a competent witness. He -- I had a chance to observe him -- extremely closely. He was within feet of me here, which is much closer than we would normally put a witness. He's not at the witness stand. He was probably, you know, maybe six feet away from me. I found him at age 13, to be – he's not in the courtroom?
> . . .
>
> I was thinking of him -- watching him very closely, . . .
>
> He's a simple child. I'm not sure. He seemed very slow to me. He does not -- when I look at factors to be considered under 601, I look at *Renna v. State*, 797 Southwest 2nd, 189. An Appellate Court decision out of Corpus Christi with no petition. In determining

whether a witness is competent to testify, the Court should consider the witnesses, (a) competence to observe intelligently the events in question at the time of their occurrence. (b) capacity to recollect the events. And (c) capacity to narrate the events which in turn involves the ability to understand the questions asked, frame intelligent answers and understand the moral responsibility to tell the truth.

In this instance with [J.P.], I actually – because I heard such inconsistency and such misunderstanding of questions, I had to myself – I got involved in the questioning because he had answered a question two different ways. He is – he misunderstood several questions that were asked of him on direct and on cross. And then would restate an answer.

I do not find this witness competent to testify. I do not find on the State's behalf that this jury would be able to believe beyond a reasonable doubt that these allegations were true. And consequently under 403, these – to allow an incompetent witness to testify, would absolutely bring unfair prejudice to this case and substantially outweigh any probative value in confusing, misleading these jurors and having them decide issues that are very important on grounds that are not valid. So, the State's request to have this child testify as to these events is denied. And the defense request to reopen with this child, who I believe to be, from my observations of his demeanor, the manner in which he answered the questions and the fact that I had to get involved in the questioning to understand any of what he was saying, is further denied.

11 RR 48-49.

The trial court's credibility determination based on her up-close and personal observation is entitled to deference. *Lavernia*, 845 F.2d 496; *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). The trial court explained why she did not allow the admission of J.P.'s testimony. In reviewing the factual findings of the trial court, this Court cannot substitute its own opinions for the determination made on the scene by the trial judge. A state court's findings and conclusions on questions of fact are entitled to deference unless Pond shows that they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

The state court's findings of fact are presumed to be correct on federal habeas review. Pond has not met his burden of rebutting the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well.

On habeas review under AEDPA, the prejudice of constitutional error in a state-court criminal trial is measured by the "substantial and injurious effect" standard of *Brecht v. Abrahamson,* 507 U.S. 619 (1993). *See, e.g., Hughes v. Quarterman,* 530 F.3d 336, 345 (5th Cir. 2008). There are guideposts in applying the standard to the facts of a given case. When a court finds itself "in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict." *Fry v. Pliler,* 551 U.S. 112 n.3 (2007) (citations and quotations omitted); *see also Robertson v. Cain,* 324 F.3d 297, 305 (5th Cir. 2003) ("[T]he petitioner should prevail whenever the record is so evenly balanced that a conscientious judge is in grave doubt."). Conversely, an error is insufficient under *Brecht* when the evidence of the defendant's guilt is overwhelming. *See, e.g., Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003). A constitutional trial error is not so harmful as to require habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993). It must have had a substantial effect or influence in determining the verdict. Based upon its own careful review of the record, this Court finds that the trial court's decision to exclude J.P.'s testimony did not have a substantial and injurious effect or influence in determining the verdict.

Pond has failed to show that there was a reasonable probability that the verdict would have been different if the trial court had not excluded J.P.'s testimony. Any such error was harmless under *Brecht v. Abrahamson,* 507 U.S. at 623. There was overwhelming evidence against Pond.

He has failed to raise an issue as to whether the trial court's decision to exclude J.P.'s testimony had an injurious effect or influence on the verdict. Pond's claim of trial court error lacks merit. Pond has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Pond is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d)(1).

## VI.    The Claim of Ineffective Assistance of Trial Counsel

### (Ground 2)

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of counsel ("IAC"), whether at trial or on direct appeal, under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*" (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986))).

Under *Strickland*, a habeas petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness, *see* 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *see also Buck v. Davis*, 580 U.S. ——, 137 S. Ct. 759, 775 (2017) (reaffirming that "[i]t is only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment' that *Strickland*'s first prong is satisfied" (citation omitted)). The petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See Strickland*, 466 U.S. at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. [B]ecause of the risk that hindsight bias will cloud

a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorney's[sic] the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted). Therefore, on habeas review under AEDPA, "if there is any 'reasonable argument that counsel satisfied *Strickland*'s deferential standard,' the state court's denial must be upheld." *Rhoades v. Davis*, 852 F.3d 422, 432 (5th Cir. 2017) (quoting *Richter*, 562 U.S. at 105).

To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "the question is not whether a court can be certain

counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case."" *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The state habeas court found that:

> 6.    This Court is familiar with the effective performance of the applicant's trial counsel, Mr. Stephen D. Jackson, who has long practiced in the courts of Montgomery County and is well-qualified for appointment in serious felony cases.

> 7.    This Court is familiar with the effective performance of the applicant's appellate counsel, Ms. Judith Shields, who has long practiced in the courts of appeal for the State of Texas and is well-qualified for appointment in serious felony appellate matters.

> 8.    This Court recalls the trial of the applicant and remembers the effective performance of trial counsel during that proceeding.

(Docket Entry No. 6-40, p. 35).

The state habeas court concluded:

> 2.    The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel, either at the time of the guilt-innocence stage or at the time of the appeal. *Strickland v. Washington*, 466 U.S. 668, 669 (1984); *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

3. The applicant has not overcome the presumption that his trial and appellate counsels' actions were based in sound strategy. *See Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012).

4. The applicant has not shown that this Court would have created error by overruling any of the objections he now says his trial counsel should have made. *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

5. The applicant has not established that if his appellate counsel were to have presented the issues he now claims should have been presented, he would have prevailed on appeal. *Ex parte Miller*, 330 S.W.3d 610, 623 (Tex. Crim. App. 2009).

(*Id.*).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are therefore analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated ineffective-assistance claims on the merits, this Court must review a habeas petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011); *see also Rhoades*, 852 F.3d at 434 ("Our federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." (citation omitted)).

In such cases, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101; *see also id.* at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more

difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal quotation marks and citations omitted)). In other words, AEDPA does not permit a de novo review of state counsel's conduct in these claims under *Strickland. See id.* at 101-02. Instead, on federal habeas review of a claim that was fully adjudicated in state court, the state court's determination is granted "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101; *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam) (explaining that federal habeas review of ineffective-assistance-of-counsel claims is "doubly deferential" "because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment'"; therefore, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt'" (quoting *Burt*, 571 U.S. at 22, 15)); *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910-11 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.").

The Court has carefully reviewed the transcript of Pond's criminal trial that began on October 5, 2009 and lasted five days. Counsel zealously defended his client throughout the trial. Counsel vociferously objected to the prosecutor's questions to the various State's witnesses. Counsel often referred to several grounds for his objections. He presented testimony in support of Pond's defense that Pond was innocent and that he had a good relationship with A.P. and his other children. The record shows that counsel was familiar with the facts and law of the case. Counsel formulated a reasonable trial strategy to discount A.P.'s credibility. Counsel vigorously cross-examined the

State's witnesses, consistent with his trial strategy. In his closing argument, counsel raised the following issues to cast doubt on A.P.'s allegations of sexual abuse:

The lack of details from A.P. even though A.P. was abused 208 times over four years;

A.P. gave inconsistent accounts regarding the number of times the sexual abuse took place;

A.P. gave inconsistent accounts regarding the locations where the sexual abuse took place;

A.P. gave inconsistent accounts regarding who was present when the sexual abuse took place;

A.P.'s mother, Pain, suspected Pond of having an affair, and she coached A.P. to make false allegations of sexual abuse against Pond;

There was no DNA evidence on A.P.;

There was no DNA evidence on A.P.'s clothing;

There was no DNA evidence on Pond's clothing;

The hymen was intact;

Dr. Thompson's expert testimony was incredible because he said everything was consistent with sexual abuse;

The sexual abuse examination found no physical trauma;

Pond's penis, which was 35 millimeters, could not penetrate A.P.'s vagina, which was 7 millimeters;

A.P. had good sphincter tone despite repeated penetration of the anus;

Though Pond's seminal fluids were found on the blanket from his marital bed, there was no testimony as to when it was deposited there;

Pond was diagnosed with testicular cancer in February 2005, and underwent surgery in November 2005;

Pond could not have abused A.P. because he was in too much pain due to the testicular cancer;

Pond could not have abused A.P. because he was sick due to chemotherapy;

Pond abused A.P. on the couch even though he knew his wife was going to run an errand that would take less than an hour;

Pain returned from her errand, discovered a missing condom, and accused Pond of molesting A.P.; and Pain allowed A.P. to kiss Pond good-by after she discovered Pond molesting A.P. 9 RR 32-56.

Through his cross-examination of the State's witnesses, counsel strove to emphasize that A.P.'s account of sexual abuse was not credible for the reasons set forth summarized in the closing argument. Having reviewed counsel's trial strategy, the Court now addresses each of Pond's claims of ineffective assistance.

### A.     Failure to Object to Testimony That Complainant Was Credible

Pond first complains that counsel failed to file a motion in limine and object to several instances of opinion testimony that the complainant was telling the truth about the sexual assaults. Pond states that the complainant testified that Pond sexually assaulted her on several occasions. However, when previously questioned about the assaults, she provided inconsistent statements about their frequency and location. Pond argues that her physical examination was normal and revealed no evidence of sexual assault. Pond testified that he did not sexually assault her. Pond complains that trial counsel, Stephen Jackson, did not file a motion in limine to prohibit opinion testimony that the complainant was telling the truth about the sexual abuse.

### 1.     Lawrence Thompson's Expert Testimony

Pond alleges that counsel should have objected to the statement of Lawrence Thompson, a psychologist at the Harris County Children's Assessment Center, that he saw no evidence that the complainant was trained to say that she was abused. Fed. Writ Pet. at 14 (citing 4 RR 62). The

record shows that the prosecutor posed a hypothetical question to Dr. Thompson. The following exchange took place:

> Q.     Okay. Now, have you ever dealt with offenders who make the claim: Momma made the kids say it?
>
> MR. JACKSON: Objection, Your Honor. Speculation. Improper opinion under 702, 703, and 705. 401, 403, there is an endless number of hypothetical situations that we could sit here all day on direct and cross-examination into the infinitive of what could happen.
>
> THE COURT: This is hypothetical --
>
> MR. JACKSON: Not only that, it's cumulative.
>
> THE COURT: Hypotheticals to experts are governed by the rules, same traditional rules that govern those kinds of questions and other questioning of other witnesses.   Counsel may include in a hypothetical, either those facts already in evidence or that will be introduced before the close of evidence or inferences reasonably drawn from those facts.  So, your objections are overruled.
>
> MR. JACKSON: Yes, ma'am. May I have a running objection for this line of questioning, please.
>
> THE COURT: Okay.
>
> MR. JACKSON: Thank you.

4 RR 58-59.

The record shows that Pond's counsel objected to questions from this witness about whether the complainant's mother trained her to say she was abused. The State proposed a hypothetical question about whether Dr. Thompson had encountered a situation where the child's account of sexual abuse is attributed to coaching by a third party. The prosecutor included in his hypothetical, facts that were introduced before the close of evidence or inferences reasonably drawn from those facts. Pond himself testified that A.P. was coached by her mother to make these allegation against Pond. During his cross-examination of A.P.'s mother, counsel asked her if she had coached A.P. because she believed Pond was having an affair. Given that counsel obtained a running objection, this claim of ineffective assistance is refuted by the record.

### 2.     Dayna Hein's Testimony

Pond next complains Dayna Hein, investigator for Family Protective Services, used the phrases "credible outcry" and "we believe the abuse had occurred." (Docket Entry No. 1, p. 14)(citing 4 RR 178). The following exchange took place:

> Q.     Right. Now, was there an ultimate determine -- an ultimate
>
> finding made regarding your investigation?
>
> A.     Yes.
>
> MR. JACKSON: Objection, Your Honor. May we approach,
>
> please?
>
> THE COURT: Yes.  (AT THE BENCH, ON THE RECORD
>
> OUTSIDE HEARING OF THE JURY)
>
> MR. JACKSON: Your Honor, I believe at this time, the State is
>
> going to ask if the finding was confirmed through CPS. It's a much

lower burden than what it is to this jury. I would argue under 401, CPS finding and abuse occurred is irrelevant to the two. It violates 403.

THE COURT: Any response?

MR. FREYER: I mean, that was what I was going to ask her. I mean, I'm asking her --

THE COURT: It's really subject for cross you can bring that out and change the way. But the truth of the matter is, you got a former CPS worker here who was on the case then. It was part of her investigation. So, I'm going to allow her to answer that question if you ask it. But you'll able to cross-examine her on the very thing you said.

MR. JACKSON: Yes, ma'am.

(BENCH CONFERENCE CONCLUDED)

. . .

Q.     All right. Now, we talked a few minutes about -- well, just before we talked about these records, what was the ultimate finding that was made by CPS in regards to the information it had in this case?

MR. JACKSON: Same objection, Your Honor.

THE COURT: That we discussed here?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay. It's overruled.

THE WITNESS: Answer?

THE COURT: You may answer.

A.   Okay. The findings on this case were reason to believe with the factors controlled.

Q.   (BY MR. FREYER) And had the situation been where Ms. Pain had not taken the kids to Alabama, what would have happened?

A.   That doesn't exactly mean we would have changed the finding.

Q.   Okay. Now, when you talk about a finding, that's a reason to believe, what do you mean by that?

A.   There was three different findings. Reason to believe, unable to determine and ruled out. Reason to believe means that there was a credible outcry, and we believe that the abuse had occurred.

4 RR 175-179.

The record shows that counsel objected on relevance grounds to Hein's testimony regarding the CPS finding that there was a reason to believe that abuse had occurred and the complainant made a credible outcry. Given that counsel objected to Hein's testimony about the CPS findings, Pond has not shown that counsel's performance was deficient. Nor has Pond demonstrated any resulting prejudice. Lisa Pickering testified that:

An outcry is when a child or an adult makes the first -- speaks for the first time of the sexual assault that's happened to them. A child is usually reluctant to make an outcry because they are dealing with trust issues and a family member; they fear getting in trouble at home; they have been threatened by their -- by their abusers that if you tell something bad is going to happen; or they worry what will happen given that the perpetrator is the breadwinner in the home.

After Pain discovered Pond and A.P. on the couch on February 26, 2006, A.P. told her mother that Pond put his private "in her butt" and "in her private." A.P. reported to her mother that Pond had been abusing her since she was in kindergarten. Tiffany Dusang, a Registered Nurse at Memorial Hermann Hospital, conducted a sexual abuse examination of A.P., who was nine years old at the time. Two days later, A.P. told Sylvia Acklin, an interviewer at Safe Harbor, that Pond had sexually assaulted her. Pond has failed to show that Hein's testimony about the CPS findings had a prejudicial effect, given that the jury heard from A.P.'s mother, the examining nurse, and a forensic examiner from Safe Harbor that A.P. gave consistent accounts of the abuse by Pond.

### 3. Lisa Pickering's Expert Testimony

Pond next argues that counsel should have objected to Lisa Pickering's testimony regarding credibility and length of time before abuse is reported. (Docket Entry No. 1, p. 14). Lisa Pickering, a detective with the Montgomery County Sheriff's Office, testified as an expert witness. 4 RR 146.

Generally, an expert witness may testify if her scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue. Tex. R. Evid. 702. The expert's testimony must aid the trier of fact and not supplant its determination. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997). However, expert

testimony that provides useful background information to aid the jury in evaluating the testimony of another witness is admissible. *Pavlacka v. State*, 892 S.W.2d 897, 902 n.6 (Tex. Crim. App. 1994) (providing that expert testimony may aid a factfinder by providing information that sexually abused children sometimes offer conflicting accounts).

Expert testimony that a child exhibits behavioral characteristics empirically shown to be common among children who have been sexually abused is relevant and admissible as substantive evidence under rule 702. *See* Tex. R. Evid. 702.4; *see also Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993); *Cohn v. State*, 849 S.W.2d 817, 819–21 (Tex. Crim. App. 1993) (such testimony not objectionable as "bolstering"). An expert may also give an opinion on facts made known to him at trial via hypothetical questions, so long as the facts used in the hypotheticals are admitted into evidence or are related to the theory of the case. *Matson v. State*, 819 S.W.2d 839, 852–53 (Tex. Crim. App. 1991). But an expert witness may not testify directly that a particular witness is truthful, or that a class of persons to which the witness belongs is truthful. *Yount*, 872 S.W.2d at 711.

> Admission of expert testimony is governed by Rule 702, which states:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue.

Tex. R. Evid. 702.

For expert testimony to be admissible, it must be sufficiently reliable and relevant to help the jury in reaching accurate results. *Tillman v. State,* 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Kelly v. State,* 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). Thus, the proponent of the

evidence must demonstrate by clear and convincing evidence that (1) the testimony is based on a reliable scientific foundation, and (2) it is relevant to the issues in the case. *Tillman,* 354 S.W.3d at 435. Rule 702's requirement that the evidence "assist the trier of fact to understand the evidence or to determine a fact in issue" is related primarily to relevance. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591 (1993)(discussing Federal Rule of Evidence 702). Expert testimony that does not relate to a fact in issue is not helpful to the jury, and consequently, is not relevant. *Daubert,* 509 U.S. at 591; *Jordan v. State,* 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). Expert testimony is relevant when it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Daubert,* 509 U.S. at 591; *Jordan,* 928 S.W.2d at 555. This condition is also referred to as the "fit" requirement. *See Daubert,* 509 U.S. at 591; *Jordan,* 928 S.W.2d at 555. The Court of Criminal Appeals observed in *Jordan* that "[r]elevance is by nature a looser notion than reliability." *Jordan,* 928 S.W.2d at 555. Further, the question whether evidence is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable. *Id.*

"The use of hypothetical questions in the examination of expert witnesses is a well-established practice." *Matson v. State,* 819 S.W.2d 839, 853 (Tex. Crim. App. 1991). The facts utilized by the hypothetical can be facts admitted into evidence or facts assumed by counsel in accordance with the theory of the case. *Matson,* 819 S.W.2d at 852. A hypothetical question and the expert's testimony satisfy the "fit" requirement if they take into account enough of the pertinent facts to be of assistance to the jury on a fact in issue. *See Tillman,* 354 S.W.3d at 438.

In *Schutz v. State*, the Court of Criminal Appeals recognized that some witnesses are viewed by society as "impaired" due to a condition or disability embodied by all persons who belong to their class. *Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1997). Examples of this phenomenon includes young children and persons who are mentally challenged. *Id. Shutz* provides that "[w]hen an 'impaired' witness or declarant is expected to testify, expert testimony should be permitted in the offering party's case-in-chief concerning the ability of the *class* of persons suffering the 'impairment' to distinguish reality from fantasy and to perceive, remember, and relate the kinds of events at issue in the case." *Id.* (emphasis in original). Such "impaired class" testimony is admissible, provided that: (1) the testimony is limited to a discussion of the *class*, rather than an *individual* witness; and (2) "should focus on the *ability* of the class to accurately perceive, remember, etc. rather than any *tendency* to do so." *Id.* at 70 (emphasis in original). Expert testimony which does not satisfy these two requirements is inadmissible. *Id.*

Likewise, the court also reiterated the rule that an expert's testimony that an *individual* witness's testimony is the product of manipulation or suggestive interview techniques is an impermissible comment on that witness's credibility; such testimony is also inadmissible. *Id.* (citing *Yount v. State*, 872 S.W.2d 706, 711–12 (Tex. Crim. App. 1993)). The court stated that such testimony does not aid a jury in its decision making, but rather, it results in an inappropriate replacement of the jury's decision regarding a witness's credibility. *Id.* at 59 (citing *Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990)). As such, expert testimony does not assist the jury and is inadmissible if it constitutes a "direct opinion on the truthfulness" of a witness's testimony. *Id.* (citing *Yount*, 872 S.W.2d at 708).

The following exchange took place during the State's direct examination of Pickering:

Q. Now, I want to talk about something else. Have you spoken to the mothers and fathers of kids that have been abused in the course of a lot of these investigations?

A. Yes.

Q. And have you found that there may have been a delay, an hour, a day, a week, between the time the parent was notified about the abuse or the time the parent was told about the abuse and then when the police are actually called?

A. Yes.

Q. All right. Does that come to a surprise to you?

A. No.

Q. I mean, in a perfect world, should every mom call the police right after it happens?

A. Yes.

Q. Do we live in a perfect world?

A. No, we don't.

Q. So, if I were to give you a hypothetical scenario where a mother waited four hours or five hours or four days or five days, would that lend you to believe that that kid didn't get abused?

A. No.

Q. Why not?

A. They're no less credible.

Q.   Why? Tell us why?

A.   There are many factors. Sometimes it takes a little while for a parent to soak in what's happened to a child. Sometimes it's all those other things, too. Parents have as far as the parents go, they may have a hard time believing it, you know. That a person could actually do this to their -- and they may have to -- they may worry about the financial end on things. It's all -- it's some of the same fears and the same factors that the children have because -- just because that's the way it is.

4 RR 149-151.

Detective Pickering was testifying as an expert witness to a hypothetical provided by the prosecutor, and she relied on her scientific or specialized knowledge to assist the jury in understanding the evidence or in determining a fact in issue. Here, the State sought to explain why A.P. waited over four years to make an outcry. Detective Pickering's testimony provided useful background information to aid the jury in evaluating A.P.'s testimony. Detective Pickering did not testify that A.P. was truthful. Detective Pickering did not state that the complainant in this case was credible. She acknowledged only that children of parents who waited to report abuse were no less credible than children of parents who immediately reported abuse. Pond has failed to establish that his counsel should have objected, that an objection would have been granted, or that the result of the proceeding would have been different had he objected.

### 4. Sylvie Acklin's Expert Testimony

Pond next objects to Sylvie Acklin's expert testimony that it did not appear that the child had been manipulated or coached. Acklin testified that she was a forensic interviewer at Children's Safe Harbor, which is the Montgomery County Children's Advocacy Center. The following exchange took place: "Q. Oh, did you ever get any indication based upon your -- the interview was 50 minutes, did it appear that she had been coached or manipulated in any way at all? A. Given the details that were provided, no." 5 RR 32.

Acklin provided her opinion as to the behavior A.P. exhibited during the interview.

Such testimony by an expert is also permissible. In *Schutz v. State*, the Court of Criminal Appeals found acceptable an expert's opinion that the child did not exhibit behaviors that point to being manipulated, and this testimony was not a direct comment on the truth of the child's allegations. 957 S.W.2d 52, 73 (Tex. Crim. App. 1997).

Pond next complains of the following testimony from Acklin: "Q. (by prosecutor) Does the mere fact that a case has small trailers or small rooms in a small trailer, render this child or any child that lives in such a place, absent other factors of course, any less believable or credible? A. No." 5 RR 32.

Here, Acklin did not state her opinion as to whether A.P. was credible or believable. She simply agreed that where a sexual assault takes place does not affect the complainant's credibility. She testified, that based on her experience, children can be sexually assaulted in trailers as well as any other small space. An objection to the testimony Pond cites would have been futile. Counsel cannot be deficient for failing to press a frivolous point. *Koch v. Puckett*, 907 F.2d 524, 527 (5th

Cir. 1990); *Green v. Johnson,* 160 F.3d 1029, 1036-37 (5th Cir. 1998), *cert. denied,* 525 U.S. 1174 (1999)(citing *Sones v. Hargett,* 61 F.3d 410, 415 (5th Cir. 1995)).

Counsel demonstrated the weakness in Acklin's testimony through cross-examination:

Q. And you don't know how detailed the mother got with Anna

Pain before coming to you, do you?

A. No.

Q. And that can be a concern at times if a parent has – I guess, get

very detailed in the conversations with their child in — regarding

an event like this, correct?

A. Yes.

5 RR 35.

Pond has not shown that counsel's performance was deficient. Nor has Pond demonstrated any resulting prejudice.

### 5. Tiffany Dusang's Testimony

Next, Pond complains when Tiffany Dusang, the sexual assault nurse examiner, testified that the absence of physical trauma did not make the complainant's history any less believable. (Docket Entry No. 1, p. 14)(citing 5 RR 66). The following exchange took place:

Q. Now, other than that, and in light of the addendum that was

done, did you note any other trauma or evidence of physical injury

in this child as it pertained to the examination that you did?

A. I did not.

Q. All right. Now, tell the ladies and gentlemen of the jury, did that come as a surprise to you?

A. No, it did not.

Q. Why?

A. I -- all the children that I have assessed, I've probably -- and this is consistent for our team really. But in my practice, less than 5 percent of the children we see have injury.

Q. So, if you -- let's say you've done 1,500 cases, like you said?

A. Around a thousand.

Q. A thousand. A thousand. So, is it safe to say you have only had approximately 50 cases out of a thousand where you have had physical trauma?

A. Correct. They were all children, yes. Correct.

Q. Did it surprise you that you didn't see any physical trauma?

A. It did not.

Q. Did the absence of physical trauma make this – this child history any less believable based upon your experience?

A. No.

Q. Why?

A. Because I don't see injury in most of our kids. And so --

Q. Why not?

> A.     Most of the times with children, and this is most definitely I
>
> could tell you with my practice, the person that has abused them or
>
> assault them is somebody that they know.   They have a loving
>
> relationship with them. Sometimes it's a family member or a close
>
> friend.  And most of the time those people are not there to tear
>
> tissue, to hurt this child.  That's not the goal.

5 RR 65-66.

The record shows that Dusang did not testify that the complainant was believable.  Rather, Dusang acknowledged that in her experience, a lack of physical trauma did not indicate that no sexual assault occurred. *See* 5 RR 66.  Dusang did not voice an opinion as to whether A.P. was telling the truth.  There were no grounds for counsel to object.  On cross-examination, Pond's counsel immediately attacked this testimony: "Q. It doesn't matter if you find absolutely nothing, you still make a finding that it's consistent with sexual abuse, correct?  A. Correct." 5 RR 72. Pond has failed to show either that his attorney failed to object or that he was deficient for not objecting in each of these instances.  He has failed to undermine the presumption that his counsel's decision not to object was based on a reasoned trial strategy.  Pond has not shown that counsel's performance was deficient.

Nor has Pond demonstrated any resulting prejudice.  The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.   Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### B. Failure to Object to Testimony That Pond Used Fear and Intimidation

Pond argues that Lawrence Thompson, a psychologist at the Harris County Children's Assessment Center, testified for the State without objection that sometimes offenders use fear and intimidation to put pressure on the child to keep abuse a secret, and that "appears to be the case here." (Docket Entry No. 1, p. 16)(citing 4 RR 60-61). Pond asserts that counsel performed deficiently in failing to file a motion in limine and object to the prejudicial opinion testimony of an experienced psychologist that Pond used fear and intimidation to keep the complainant quiet. The prosecutor continued to ask Thompson about his experience with sexual assault cases in general. 4 RR 58.

> Q. Okay. Now, when you talk about the use of fear and intimidation to abuse a child, what do you mean by that?
>
> A. Just different things that offenders will do to get the child to go along with the abuse. And to keep the abuse a secret. You have to believe that if the child is able to disclose the abuse, hopefully some adult or someone else would come to their aid and stop the abuse from happening. So, many times what you see offenders try to establish early on in the abuse of kids is an agreement with the child, implicit or explicit that this is between us. You're not to tell anybody else about what's happening. You need to keep this abuse a secret.
>
> Q. Does that appear to be the case based upon, doctor, what you have reviewed in this case?

A. Yes. In some of what I reviewed, there was reference to the child being told by the alleged perpetrator to keep the abuse a secret.

MR. JACKSON: Objection, Your Honor. Hearsay.

THE COURT: That's overruled.

MR. JACKSON: And violation of the confrontation clause.

. . .

THE COURT: That's overruled.

. . .

Q. Based upon what you reviewed, doctor, did that appear to be the case where you following up on your -- what you had said about fear and intimidation, did you find those -- that pattern running through the materials that you saw in coming to court today?

MR. JACKSON: I would reurge my same objection, Your Honor. I would ask for a running objection on that question.

THE COURT: Okay. It's overruled. And your objection -- your running objection request is granted.

MR. JACKSON: Thank you.

A. Yes. There was evidence in the documents that I reviewed that the child had been asked to keep the abuse a secret.

Q. And did your review of what you reviewed in coming to court, the police report and some witness statements and stuff, indicate to you in any way, shape or form based upon your training and

experience, doctor, that this child was influenced or coached in any way?

A.    I saw no evidence of that.

4 RR 60-62.

Counsel entered several running objections with regard to Dr. Thompson's testimony. He entered a running objection to the line of questioning as to whether the perpetrator was someone in a position of trust with A.P. 4 RR 37. He entered running objections with regard to the prosecutor's numerous hypotheticals. Counsel objected to the prosecutor's questions regarding the use of fear and intimidation, but the trial court overruled it. Pond complains that Dr. Thompson was allowed to testify, without objection, that A.P. had not been coached. Pond argues that counsel's prior objections did not apply to this question and testimony because the prior objections related only to the prosecutor's hypothetical question. (Docket Entry No. 18).

Dr. Thompson was testifying as an expert, providing his opinions on the documents he reviewed in this case, as to whether Pond asked A.P. to keep the abuse a secret. The following exchange took place during the State's direct examination of A.P.:

Q.    Did he do anything bad to you?

A.    Yes, sir.

Q.    Tell the ladies and gentlemen of the jury, the first time you remember him doing something bad to you?

A.    I don't exactly remember how old I was or what grade I was in, but I think I remember my mom saying something like I was in first or kindergarten.

Q.    Okay. So, you were real little, right?

A.    Yes, sir.

Q.    And what do you remember that he did?

A.    The same thing that he's been doing.

Q.    Okay. And I'm not going to ask you very long about it. Okay,

sweetie. We just need to know -- try to tell the ladies and gentlemen

of the jury, these people here, what he did exactly? Like we talked

about.

A.    Well, what do you -- what are you asking? I don't understand

the term.

Q.    Sure. Did he -- did he touch your privates?

A.    Yes, sir.

Q.    And how did he touch your privates?

A.    He touched them with his private.

Q.    And when the first time you remember that happening, what

were you thinking when that happened to you, [A.P.]?

A.    I don't remember, but I was scared.

Q.    And did he -- when he did that, did he pull your underwear

off so he can do -- so he could touch your private?

A.    Yes, sir.

Q.    And did he touch your -- did he touch your bottom like right

here, State's 32, right here?

A.    Yes, sir.

Q.    And did he touch the inside of your bottom with his private?

A.    Yes, sir.

Q.    And when he did that to you, [A.P.] -- and when you talk about your private, is this your private right here that's yellow on the little drawing here?

A.    Yes, sir.

Q.    And do you remember when you went and talked to the lady on the T.V. where you -- you -- she circled these where you pointed where they were?

A.    Yes, sir.

Q.    Like your eyes and your hair and stuff?

A.    Yes, sir.

Q.    And looking at State's 31, is this what he touched you with?

A.    Yes, sir.

Q.    Okay. Let me ask you something, sweetie. Why didn't you tell your mommy when that happened?

A.    I was scared. I don't know what I was scared, but I just know he could think of something.

Q.    Did he ever tell you not to tell your mom?

A.    Yes, sir.

Q.    Tell us what you remember he said. Not exactly that time, but

when he do these things to you, tell the ladies and gentlemen what

he said to you and why you didn't tell.

A.    He only said it to me the first time he ever did that to me. And

he said don't tell anybody I did that to you.

6 RR 125-128.

The record shows that counsel vigorously objected to Thompson's testimony regarding the

use of fear to intimidate A.P.  An objection was not merited in this instance.  Furthermore, the

testimony Pond finds objectionable was cumulative.  A.P. testified that she did not tell her mom

because she was scared and that the first time he assaulted her, he told her not to tell anyone. 6 RR

127-128. Pond has not shown that counsel's performance was deficient and that Pond was

actually prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 68 (1984).

The state court's decision as to the effective assistance of counsel reasonably applied the

law to the facts, consistent with clearly established federal law.  Pond has not shown a basis for

the relief he seeks.  28 U.S.C. § 2254(d)(1).

**C.    Failure to Object to the Court's Alleged Comment on the Weight of the Evidence**

Pond asserts that the court's remark regarding whether a witness changed her testimony

amounts to a comment on the weight of the evidence that required an objection.  (Docket Entry

No.1, p. 17).  Pond states that counsel attempted to impeach Detective Pickering with her prior

inconsistent statement about the importance of the interview of a child sexual assault complainant

by a forensic examiner.  The State objected, and counsel responded that, "I'm just trying to figure

why she's regressing what she said." The trial court responded that, "I don't think she's done that." 4 R.R. 163.

Pond argues that Judge Hamilton should have overruled the objection to counsel's attempt to impeach the witness with a prior inconsistent statement instead of commenting, "I don't think she's done that." Pond argues that this comment by Judge Hamilton improperly communicated to the jury her opinion that the witness was credible.

The following exchange took place during the State's direct examination of Detective Pickering:

> Q.     All right. Let's talk about this case. At some point, were you
>
> assigned a case involving a little girl who made an outcry of abuse,
>
> a little girl named, Anna Pain?
>
> A.     Yes.
>
> Q.     Tell us how you got involved in that case, detective, and
>
> some of the initial steps that you took?
>
> A.     Okay. As I explained earlier about how we get our cases,
>
> that's how the case came to me.
>
> Q.     Okay.
>
> A.     Many times, whenever -- whenever -- sometimes people call
>
> us, meaning law enforcement and CPS, at the same time.
>
> Q.     Right.

A.     When that happens, we have a CPS case that comes in, and we have an offense report, like the report I got, that comes in. We coordinate with CPS.

Q.     Why do you coordinate with CPS?

A.     We always do. Because when there are children involved, we have to. We have to coordinate with CPS as far as our investigations go. We have a Children's Safe Harbor here in our county. And that is where the children are taken to be interviewed if -- and those that are -- the whole purpose is so they don't have to tell their story 15 gillion times.

Q.     And that gets back to something I wanted to ask you later. Did you actually directly speak to Anna Pain?

A.     No.

Q.     Now, was there a policy in place where it was better thought that the child speak to a -- to the trained interviewer rather than to a bunch of people?

A.     That's the way cases are handled, yes.

Q.     All right. And is that what happened in this case?

A.     Yes, it is.

Q.     And was this child later interviewed by a Sylvie Acklin?

A.     Yes, she was.

Q.     Griffin at the time?

A.     Yeah.

Q.     Okay. So, tell us -- okay. You mentioned that the kids are taken to Safe Harbor. Well, tell us what happened?

A.     Okay. First of all, CPS -- when CPS gets the case to, they got -- they set up the interview. The CPS set up the interview. We go over to the Safe Harbor. What happens is the prosecutor, CPS, law enforcement, whoever else is involved in the case observes from a remote room.

Q.     Okay. Now, let's talk about that situation for a second. A remote room, does that remote room connected to audio and video, so it's sort of like what you see on T.V.? You got a -- you know, is there a mirror or something you can watch?

A.     You watch a screen.

Q.     You watch a screen. And based upon what you remember, was that device that you watched, did it accurately depict and cover and record that interview?

A.     Yes.

Q.     Were you able to understand both Ms. Acklin and Anna Pain as she depicted the versions of events that she gave about what this defendant did to her?

A.     During the time of the interview, yes.

Q.    All right. Tell us what happened after that?

A.    Okay. So -- well, the interview was -- the interview was conducted. She made an outcry. She was --

MR. JACKSON: Objection, Your Honor, as to what the child said. It's hearsay; and it's in violation of the confrontation clause, both state and federal.

MR. FREYER: I can tailor it so it won't implicate the hearsay rule.

THE COURT: Okay. Thank you. Sustained.

Q. (BY MR. FREYER) Without going into what the child exactly said, but based upon –

MR. JACKSON: Your Honor, just for the record, may I ask the jury to disregard that last question and answer.

MR. FREYER: She never said what the kid said.

MR. JACKSON: If there was an answer said, I would ask the Court to instruct the jury to disregard the question.

THE COURT: Okay. I am -- let me talk -- attorneys, if you can come up here for one second.

MR. JACKSON: Sure.

(AT THE BENCH, ON THE RECORD, OUTSIDE HEARING OF THE JURY)

THE COURT: Is the video going to be shown?

MR. FREYER: Well --

THE COURT: Is there a video?

MR. FREYER: They've already opened the door to prior consistent statements coming in. He did that in voir dire and in opening statements. So, yes, the video will be shown at some point.

MR. JACKSON: Now, in voir dire and in opening statements, that's not evidence. I can't --

MR. FREYER: Sure as heck can.

THE COURT: Well, I'm just thinking under 38, I'm just trying to figure out what's going to happen.

MR. FREYER: The statement, at some point is going to come as no surprise. He's going to call momma a liar. And he's going to call the kid a liar.

THE COURT: Well, I'm not thinking about --

MR. JACKSON: At that point, if he wants to do it –

MR. FREYER: I'm not going to do it right now, Steve.

MR. JACKSON: I know.

THE COURT: Okay. I'm going to sustain the objection. I just didn't know.

(BENCH CONFERENCE CONCLUDED)

MR. JACKSON: Will you instruct the jury to disregard the previous question, Your Honor?

THE COURT: Yes. I don't think -- it didn't elicit an answer. I think there was only a question; is that right?

MR. JACKSON: I believe that's correct.

THE COURT: Okay. Please disregard the previous question.

MR. JACKSON: And ask for a mistrial, please.

THE COURT: It's overruled. Denied.

Q.     (BY MR. FREYER) Now, at this point, had you spoken to Ms. Pain, momma?

A.     No. I had not. You mean, while the interview was going on? No.

Q.     All right. But did you speak to her afterwards?

A.     Yes. Uh-huh.

Q.     All right. And after -- after the -- do you remember how long the interview was? Was it over an hour?

A.     I don't remember. I'm sorry, I don't remember when it was.

Q.     Now. Based upon the information that you got from speaking to Ms. Pain, without going into what that was specifically, and your review of the report, and the review -- sitting in on the Safe Harbor video, at some point -- well, what did you do after that?

A.     I put the case together and brought it over to the DA's office.

Q.     And were charges later filed and accepted on this?

A.     They were.

Q.     All right. Now, at some point after the interview was conducted, detective, did Ms. Pain provide you some information in an attempt to locate this defendant?

A.     Uh-huh, she did.

Q.     Had you learned that when this defendant -- when -- when Toni Pain called the police this defendant had fled out of the house?

MR. JACKSON: Objection. Hearsay.

MR. FREYER: I'll rephrase.

THE COURT: Okay. Thank you. Sustained.

MR. FREYER: Sorry.

Q.     (BY MR. FREYER) Did anybody know where this defendant was -- was he there when the police came out?

A.     No.

Q.     When Detective Bruce came out?

A.     No.

Q.     Did anybody know when this was -- when this girl was being interviewed?

A.     No.

Q.     And did -- just going back, very quickly here. To your knowledge, did -- did Anna Pain undergo a sexual assault exam?

A.     She did.

Q.    And have you spoken to children and as part of investigation where little kids are involved or you know victims in undergoing SANE, S-A-N-E, or sexual assault exams?

A.    Have I been involved with them before?

Q.    Yes.

A.    Has it happened in cases -- in my cases prior?

Q.    Yes.

A.    Yes.

Q.    And are you familiar with the nature and the procedure that a child -- a child has to undergo in such ordeal?

A.    Yes.

Q.    And is it something that you would characterize as being an enjoyable experience?

A.    No.

Q.    Why not?

A.    Well, are you asking me -- what is it you want to know?

Q.    Basically, your experience. Meaning, is a -- is there anything that -- I mean, is it a traumatic experience for a child to undergo an exam like this, based upon the cases that you have worked on?

A.    I would not want my child to have to go through it.

Q.    Okay.

MR. FREYER: Pass the witness.

THE COURT: Okay. Mr. Jackson.

MR. JACKSON: May I have just one minute, Your Honor?

THE COURT: Yes.

**CROSS-EXAMINATION BY MR. JACKSON:**

Q.     Detective Pickering, you spoke briefly about this forensic examiner, the person who will talk to the child at Children's Safe Harbor, correct?

A.     The interviewer, yes.

Q.     And that's -- this person is called a forensic interviewer, one of the words what we would use for that person?

A.     That's the term. That's the term, yes. That's the title.

Q.     And a forensic interviewer is someone who is specially trained to promptly interview a child, correct?

A.     Yes.

Q.     Okay. Because one of the things that we don't want to have happen is we don't want multiple interviews of a child that could lead to what's called, I guess, contagion or contaminating the statement, correct?

A.     Could you say that again?

Q.     Okay. Are you familiar with the word "contagion?"

A.     What is it that you're asking me about it.

Q.     Are you familiar with that term?

A.     The word "contagion?"

Q.     Yes.

A.     No.

Q.     Okay. Are familiar with, I guess, a scenario where nonforensic interviewers improperly interview a child and can cause that child to make statements that otherwise might not be true?

A.     No.

Q.     Okay.

A.     Not familiar with that. I have not seen that.

Q.     The whole purpose is that we want a forensic interviewer to make sure it's done correctly, correct? Make sure the statement from the child is done right, correct?

A.     Well, I think that would be anyone's goal, yes.

Q.     Right. And the reason why these people are especially trained is to make sure that in the interviewing process, they don't make suggestive answers. They don't reward them for their answers. Things of that nature.

A.     Right.

Q.     Because we don't want the child to think that by giving a different answer they might be rewarded for it, right? Might be one of the reasons we would have a person who is specially trained to interview a child?

A.     I'm sorry. Are you saying that that's what our interviewers do?

Q.     No. Not at all.

A.     Okay. I don't understand what you're asking me.

Q.     The reason why we don't want multiple people interviewing the child, other than the forensic interviewer, is because we want to make sure that the statement elicited is correct?

A.     But the outcry is not always made to the interviewer first.

Q.     I'm not talking about the outcry. I'm just talking about people -- like a police officer on the scene and other individuals prior to that child getting to the forensic interviewer, we don't want multiple interviews of that child prior to that child getting to the forensic examiner, correct?

A.     I really couldn't answer that for sure. That's a very -- there are many factors there.

Q.     Okay. And you would be -- our county -- I guess, do we require the child to be interviewed by a forensic examiner? Let me ask you a better question. The Children's Safe Harbor, we want to make sure that the employed there are truly forensic examiners talking to the children, correct?

A.     Who wants to make sure, sir?

Q.     Okay. Do you believe it's important to have a forensic examiner talk to the child to get a proper statement from the child?

A.     Okay. I can't give one pad answer for that because it depends on the age of the child and their understanding. Okay.

Q.     So, you think because of the age of the child, it's okay to have someone who is not a forensic examiner versus someone who is?

A.     It depends on who that person is.

Q.     And do you have any literature or -- where do you get this theory? This is the first time I've ever heard this. Where do you get this?

MR. FREYER: Objection. To the side bar, Judge.

THE COURT: Okay. I really just want to focus on maybe what this detective had to do with the case. Mr. Jackson, can you get us back on track.

MR. JACKSON: I'm trying to, Judge.

THE COURT: Because I'm really thinking there's some misunderstanding going on here anyway.

MR. JACKSON: Okay.

Q.     (BY MR. JACKSON) Do you understand what a forensic -- forensic examiner is?

A.     Yes.

Q.   Okay. Am I upsetting you by my questioning?

A.   No.

Q.   Do you understand the point to my questioning about the necessity of not having multiple people, like let's say, you would have --

THE COURT: I think this witness is the very one who told us about that earlier. That that's why it's important the child doesn't –

MR. JACKSON: Okay. Well, I'm just trying to figure out why she's regressing what she said.

THE COURT: I don't think she's done that, Mr. Jackson. That's why I think there's a misunderstanding going on here. So, if you can get us back on board with --

MR. JACKSON: Actually, Judge. I think that's all I needed from her. Pass the witness.

4 RR 152-164.

> In ruling upon the evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

Tex. Code Crim. Proc. Ann. Art. 38.05 (Vernon 1979).

"[I]n determining whether a trial judge overstepped the bounds of acceptable conduct - that is, violated his duty to conduct the trial impartially," the Fifth Circuit has held that it must "view the proceedings as a whole." *United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988)

(citing *United States v. Williams*, 809 F.2d 1072, 1088–89 (5th Cir. 1987); *United States v. Carpenter*, 776 F.2d 1291, 1294 (5th Cir. 1985)). "[E]ven a comment arguably suggesting a judge's opinion concerning guilt is not necessarily reversible error but must be reviewed under the totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions." *Id.* "As a general rule, a defendant complaining of judicial bias must demonstrate that the error was substantial and that it prejudiced his case to obtain a reversal of his conviction." *Id.* (quotation omitted). "Federal judges have wide discretion with respect to the tone and tempo of proceedings before them; they are not mere moderators or hosts at a symposium." *United States v. Adkins,* 741 F.2d 744, 747 (5th Cir. 1984) (quotation omitted). A judge "may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion." *Id.* (quotation omitted). In this case, the transcript reflects that the court did not stray from neutrality, and Pond was not denied a constitutionally fair trial in this regard. *See id.*

Pond has not shown that the purportedly improper comments by the trial judge amounted to error that was substantial and prejudicial to Pond's case." *Wallace,* 32 F.3d at 928 (internal quotations omitted). In reviewing this issue, this Court considers "the record as a whole rather than viewing individual incidents in isolation." *Id.* In the context of this case, it is unlikely that the jury would have interpreted this brief comment as communicating the court's view of the evidence. The comment was likely, and would probably have been understood by the jury as, a reference to the fact that there appeared to be some misunderstanding on the part of Detective Pickering. Counsel was cross-examining Pickering about the role of a forensic examiner to limit the number of times a child must recount the sexual abuse to law enforcement. Detective

Pickering had previously testified on direct examination that children who were sexually abused were brought to the Safe Harbor where they would be questioned by forensic interviewers. The interview was recorded and observed by other law enforcement officials. Detective Pickering explained that "the whole purpose is so they don't have to tell their story 15 gillion times." Counsel indicated that he was trying to understand why Detective Pickering was retracting her earlier testimony. The court observed that Detective Pickering had not retracted her earlier testimony about the importance of having the child speak to one forensic interviewer about the abuse. The trial court asked counsel to try to focus on Detective Pickering's involvement with the case. The trial court was within its discretion to maintain the pace of the trial by interrupting or cutting off counsel. Pond has not shown that counsel's performance was deficient and that Pond was actually prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 68 (1984).

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## D. Failure to Object to Witness's Use of the Term "Victim"

Pond alleges that his counsel was ineffective when witness Faith Davis referred to the complainant as the victim, when describing her forensic analysis test results. (Docket Entry No. 1, p. 18). Pond argues that it is improper to refer to the complainant as a "victim" where there is a dispute as to whether a crime was committed. In support of his position, he cites *Talkington v. State*, 682 S.W.2d 674 (Tex. App. - Eastland 1984, pet. ref'd). In that case, the appellant had been convicted of rape in a jury trial. 682 S.W.2d at 674. The trial court referred to the complainant as the "victim" in its charge to the jury. *Id.* at 674–75. The Texas Court of Appeals

held that referring to the complainant as a "victim" when the sole issue was whether she had consented to the sexual intercourse was reversible error. *Id.* at 675. Pond acknowledges the distinction between *Talkington* and this case. In *Talkington,* the court referred to the complainant as a victim, whereas here Pond complains about references made by witnesses and counsel—but nonetheless argues that such references are equally improper because they lack probative value and are unduly prejudicial. Pond also cites *Veteto v. State,* 8 S.W.3d 805, 816 (Tex. App. - Waco 2000, pet. ref'd) (holding that the judge's use of the term "victim" amounted to a comment on the weight of the evidence because it was disputed whether the complainant was a victim of a crime). The word "victim" is "not so inflammatory or prejudicial as to necessarily cause harm to the defendant when used occasionally in a lengthy trial by the attorneys or witnesses." *Weatherly v. State,* 283 S.W.3d 481, 486 (Tex. App. – Beaumont 2009, pet. ref'd).

The Corpus Christi court rejected a similar argument. *See Gonzalez v. State,* No. 13–13–00427–CR, 2014 WL 4049800, at *16 (Tex. App. – Corpus Christi Aug. 14, 2014, pet. ref'd) (citing *Weatherly,* 293 S.W.3d at 486; *Byler v. State,* No. 03–01–00012–CR, 2002 WL 347753, at *3 (Tex. App. – Austin Mar. 7, 2002, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that counsel was ineffective "by allowing the State to use the word 'victim'" and collecting cases where prosecution employed terms such as "this killer" and "butcher" to refer to defendant)). "[T]he word 'victim' is mild and non-prejudicial, and is commonly used at trial in a neutral manner to describe the events in question . . . . it is not error for the State, witnesses, or defense counsel to use the word 'victim' at trial." *Tollefson v. Stephens,* Nos. SA: 14–CV–144–DAE, SA: 14–CV–171–DAE, 2014 WL 7339119, at *17 (W.D. Tex. Dec. 23, 2014).

Terms like "victim," "murder," "crime," and "crime scene" are frequently used in homicide trials, and in the greater context of the testimony in this case, the Court finds that the term "victim" carried no specific implication of guilt. *See Cueva v. State,* 339 S.W.3d 839, 864 (Tex. App. - Corpus Christi 2011, no pet.) (holding that defense counsel's use of the word "victim" was not deficient "in light of the fact that such terms are commonly used at trial in a neutral manner to describe the events in question and, in context, carry no implication that the person using such terms has an opinion one way or the other about the guilt of the defendant."). For these same reasons, trial counsel's failure to object to the use of the term does not constitute deficient performance.

Faith Davis worked as a forensic scientist for the Texas Department of Public Safety Crime Laboratory in Houston. The following exchange took place on the State's direct examination of Davis: "Q. Okay. And when you did the analysis on these tape lifts, were they from a blanket? A. Let me check my notes. I have tape lifts from the victim's sweat pants, the victim's blanket, the victim's yellow shorts and the victim's shirt." 6 RR 56. Ms. Davis was referring to her notes when she used the term "victim." Nothing in the record suggests that she was trying to state her opinion that Pond was already guilty. Unlike the use of the term in *Talkington* and *Veneto*, Davis was only a witness, not the trial court judge, and consent was not an issue in Pond's case. Additionally, had counsel objected, this would have drawn more attention to the word "victim" and swayed the jury against Pond.

A review of the transcript shows that this is one of a few occasions that the State used the term "victim" during the guilt-innocence phase of the trial. Pond has not shown that the very limited use of this term amounted to a denial of his constitutional rights; as the jury was clearly

aware, the State's position in the trial was that the complainant was a "victim," and so the use of this term was simply an expression of the State's theory of the case. In addition, as the Respondent points out, Texas courts have found that the use of language stronger than "victim" is not reversible error. *See, e.g., Lopez v. State,* 162 Tex. Crim. 454, 286 S.W.2d 424, 425 (Tex. Crim. App. 1956) ("slaughter"); *Espalin v. State,* 90 Tex. Crim. 625, 237 S.W. 274, 279 (Tex. Crim. App. 1921) ("this killer"); *Jones v. State,* 900 S.W.2d 392, 397 (Tex. App. - San Antonio 1995, pet. ref'd) ("sex slave"); *White v. State,* 699 S.W.2d 607, 615 (Tex. App. - Dallas 1985, pet. ref'd) ("butcher").

The Texas courts have acknowledged that if the reference to "the victim" is made by the *trial court,* rather than the prosecutor, this could be considered error. This is because such a comment, made by the trial court, is considered a comment on the weight of the evidence. *See Veteto v. State,* 8 S.W.3d 805, 816 (Tex. App. - Waco 2000, pet. ref'd) (abrogated in part on an unrelated issue in *State v. Crook,* --- S.W.3d ---, slip op. no. PD-0001-07 (Tex. Crim. App., Feb. 6, 2008)) (not yet published); *Silva v. State,* 831 S.W.2d 819, 823 (Tex. App. - Corpus Christi 1992, no pet); *Talkington v. State,* 682 S.W.2d 674, 675 (Tex. App. - Eastland 1984, pet. ref'd). No such concern attaches to the use of the term by the prosecutor or the State's witness; as noted above, the jury was well aware that the prosecutor's position in the case was that the complainant was the victim of a sexual assault, and that Pond's position was that the complainant fabricated the charges based on her mother's instructions.

The Fifth Circuit has stated that in federal habeas actions, improper jury argument by the State does not present a claim of constitutional magnitude unless it is so prejudicial that the petitioner's state court trial was rendered fundamentally unfair within the meaning of the

Fourteenth Amendment's Due Process Clause. *Felde v. Blackburn,* 795 F.2d 400, 403 (5th Cir. 1986). To establish that a prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, the petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that, in probability, but for the remarks no conviction would have occurred. *Felde,* 795 F.2d at 403, citing *Kirkpatrick v. Blackburn,* 777 F.2d 272, 281 (5th Cir. 1983).

In this case, even if the single use of the word "victim" in jury argument by the State was improper, a highly dubious proposition, Pond has not shown that this was so prejudicial that his trial was rendered fundamentally unfair, nor that the evidence was so insubstantial that but for this remark, no conviction would have occurred. Pond has not shown that counsel's performance was deficient and that Pond was actually prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 68 (1984).

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### E. Failure to Call Complainant's Brother as a Witness

Pond complains that counsel was deficient for failing to call complainant's brother, J.P., to testify on whether she was encouraged by her mother to fabricate the allegations against Pond. (Docket Entry No. 1, p. 21). As previously discussed in section V, *supra*, the complainant's brother, J.P., was called as a witness for the State, but the judge determined that he was not competent. 11 RR 48. Further, counsel explained the reason why he did not call J.P. to testify – though he tried, he had no access to him. 11 RR 38. The investigator he hired had no success in

interviewing the complainant or her family. 11 RR 39, 40. "In all my years, handling approximately 9,000 cases both criminal and family, civil litigation majority being criminal, never [have I] had [the] opportunity that a mother would let me get near their children." 11 RR 42. Counsel's explanation indicates that J.P.'s testimony likely would not have been favorable to Pond, and the record also supports this.

Decisions on the presentation of evidence and witnesses are essentially strategic. Counsel is entitled to a presumption that his performance was adequate. Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy. *Wilkerson v. Cain*, 233 F.3d 886, 892-93 (5th Cir. 2000)(citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983)). There is no basis other than speculation to support Pond's argument that the outcome of the trial would have been different had counsel offered the testimony of J.P.

*Strickland* required Counsel to undertake a reasonable investigation. 466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). In assessing the reasonableness of Counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed in light of Pond's own statements and actions. *Strickland*, 466 U.S. at 691. To prevail on an ineffective assistance claim based on counsel's failure to call a witness, Pond must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Del Toro v. Quarterman*, 498 F.3d 486, 490-91 (5th Cir. 2007) (finding counsel's choice to not hire an expert reasonable under the circumstances).

Pond is unable to show a reasonable probability that, had counsel called J.P., the jury would have acquitted him. Additionally, had counsel called J.P., the prosecutor would most likely have cross-examined J.P. about how Pond had shown J.P. pornography. As previously discussed with regard to Pond's first claim, the prosecutor provided notice of his intent to show that Pond showed J.P. pornography. 8 RR 133; CR 112-113. And, in a hearing outside the presence of the jury, J.P. testified that the inappropriate touching incidents were based on what he remembered, not what his mother told him. 11 RR 35. It is likely that J.P. would have testified that Pond introduced him to pornography and watched it with him when he was very young and that he remembered Pond inappropriately touching him. Thus, Pond has failed to show that J.P. was competent to testify and that he would have testified favorably for Pond. Because evidence that the mother of A.P. had coached A.P. to make false allegations against Pond was already before the jury, Pond fails to show that counsel's strategic decision not to present more of the same was deficient. Defense counsel is not deficient for failing to present evidence that is duplicative or double-edged. *See Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999). Likewise, Pond has not demonstrated that the outcome of his trial would have been any different if counsel had presented J.P.'s testimony.

Accordingly, given the weight of the other evidence against Pond, he is unable to establish prejudice arising from this alleged error, and the state court's denial of relief was not an unreasonable application of *Strickland. Berghuis v. Thompkins,* 560 U.S. 370, 390 (2010); *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008). Pond has not shown that counsel's performance was deficient and that Pond was actually prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 68 (1984).

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## VII.    The Claim of Ineffective Assistance of Appellate Counsel

### (Ground 3)

Pond asserts that his appellate counsel rendered ineffective assistance. Persons convicted of a crime are entitled to effective assistance of counsel on direct appeal. *See Evitts v. Lucey,* 469 U.S. 387 (1985). This Court reviews counsel's appellate performance under *Strickland v. Washington,* 466 U.S. 668 (1984). *See Goodwin v. Johnson,* 132 F.3d 162, 170 (5th Cir. 1998). Pond must allege and present facts that, if proven, would show that his attorney's representation was deficient and that the deficient performance caused Pond prejudice. *See Strickland,* 466 U.S. at 687-88, 692; *Jones v. Jones,* 163 F.3d 285, 300 (5th Cir. 1998).

The first element requires Pond to show that his appellate counsel's conduct "fell below an objective standard of reasonableness." *United States v. Williamson,* 183 F.3d 458, 463 (5th Cir. 1999)(quoting *Strickland,* 466 U.S. at 688). This Court's review is deferential, presuming that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Effective assistance of appellate counsel does not mean counsel will raise every available nonfrivolous ground for appeal. *See Evitts,* 469 U.S. at 394; *West v. Johnson,* 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *See Evitts,* 469 U.S. at 394.

In the appeals context, this means Pond must first show that his counsel failed to raise "a particular nonfrivolous issue" that "was clearly stronger than issues counsel did present." *Dorsey*

*v. Stephens*, 720 F.3d 309, 320 (5th Cir. 2013) (quoting *Smith v. Robbins* 528 U.S. 259, 288 (2000)). Counsel is required to raise only "[s]olid, meritorious arguments based on directly controlling precedent." *Id.* (alteration in original) (quoting *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)).

Pond must then show "a reasonable probability that, but for his counsel's unreasonable failure to [raise an issue], he would have prevailed on his appeal." *Id.* at 321 (alteration in original) (quoting *Smith*, 528 U.S. at 285). Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. 745, 751–753 (1983). A reasonable attorney has an obligation to research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful. *See Strickland*, 466 U.S. at 690-91.

To show prejudice, Pond must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones*, 163 F.3d at 302 (quoting *Strickland*, 466 U.S. at 694). Such a reasonable probability makes the proceeding unfair or unreliable, so as to undermine confidence in the outcome. *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998)(citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

### A.    Failure to Challenge Inflammatory Questions

Pond complains that Appellate counsel failed to raise the issue that the trial court erred in allowing the prosecutor to refer to Pond as a "coward." Pond complains that appellate counsel failed to raise the issue that the trial court abused its discretion in failing to grant a mistrial and allowing the prosecutor to engage in repeated argumentative cross-examination of Pond. Pond asserts that the prosecutor asserted during opening statement that, when Pain returned home, Pond

ran like the "coward . . . he is," and "that's what cowards do, they run." (4 R.R. 13-14). Pond notes that the prosecutor's remaining cross-examination consisted entirely of highly inflammatory argumentative questions that served no purpose but to inflame the jury against Pond:

- "You did what cowards do, you ran?"

- "You're just going to play dumb like you have for the last three days?" (8 R.R. 142)

- "You think your right to a trial means that you get to come in here and insult the jury's intelligence?"

- "Do you think we are a bunch of fools?" (8 R.R. 143)

- "How many excuses have you and your lawyer thrown out in front of this jury?" (8 R.R. 144)

- "Did ya'll come up with a theory, it's too big, it don't fit? [sic]"

- "Were you not paying attention in your own trial?" (8 R.R. 145)

- "Did [the complainant] look like she was comfortable sitting up there next to you?" (8 R.R. 147)

- The "allegation doesn't boost [the complainant's] self-esteem?" (8 R.R. 149)

- "She doesn't stand to gain anything to come in here, tell a bunch of total strangers that you pulled her pants down and put your private in her butt?" (8 R.R. 150-51)

- "She came into the courtroom and said you molested her. And you're saying she's not easily manipulated. Pick a horse and ride it." (8 R.R. 153)

- "Do you think we were born yesterday?" (8 R.R. 156).

- "She drove all the way to Alabama. You think, all because of you, is that what you're telling us? Are you that special?" (8 R.R. 166)

- "Is it that big of a deal over her wanting to get back at you, that she uprooted her job, her house, and her kids from school, and took them four states away all because of you, is that what you're telling us? Is that what you have the audacity to tell these people" (8 R.R. 167)

- "Why are you glaring at me?" (8 R.R. 168-69)

- "Are you arrogant enough to believe that these people believe that?" (8 R.R. 172).

Pond argues that the prosecutor's asking Pond questions in this manner was argumentative and improper. On appeal, Pond's appellate counsel raised the following nine points of error:

> First Point of Error:
> The trial court erroneously denied Appellant's challenge for cause to Juror #12, Tara Weinzettle; therefore, Appellant's substantial rights were affected because the error had a substantial and injurious effect or influence in determining the jury's verdict.
>
> Second Point of Error:
> The trial court erroneously denied Appellant's challenge for cause to Juror #19, Donald Frazee; therefore, Appellant's substantial rights were affected because the error had a substantial and injurious effect or influence in determining the jury's verdict.
>
> Third Point of Error:
> The trial court erroneously denied Appellant's challenge for cause to Juror #39, Barbara Huddleston; therefore, Appellant's substantial rights were affected because the error had a substantial and injurious effect or influence in determining the jury's verdict.
>
> Fourth Point of Error:
> The trial court erred in denying Appellant's request for the State to elect which sexual act it would rely on for conviction, and Appellant suffered constitutional harm from the error.
>
> Fifth Point of Error:
> Appellant was denied his due process right to effective assistance on appeal in violation of his Fourteenth Amendment due process rights under the Federal Constitution, and Art. I, section 10 of the

Texas Constitution because the trial court failed to make the State elect on which aggravated sexual assaults it would rely on. As a result a legal and factual sufficiency analysis is impossible.

Sixth & Seventh Points of Error:
When viewing the evidence in a light most favorable to the verdicts, no rational juror could have believed beyond a reasonable doubt that Appellant is guilty of aggravated sexual assault of a child; therefore, the evidence is legally insufficient. Additionally, in reviewing the evidence in a neutral light, the evidence is so weak that the verdict is clearly wrong, and manifestly unjust and the contrary evidence is so strong that the State did not meet its burden of beyond a reasonable doubt; therefore, the evidence is factually insufficient.

Eighth Point of Error:
Appellant's substantial rights were affected when the trial court abused its discretion and refused to allow him to reopen to introduce the testimony of JP.

Ninth Point of Error:
The trial court abused its discretion in finding JP incompetent to testify, and this error constituted constitutional harm. The exclusion of JP's testimony contributed and had more than a slight effect to the convictions of Appellant.

(Docket Entry No. 6-9, pp. 8-9).

Texas Rule of Evidence 611(b) provides "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tex. R. Evid. 611(b). The trial court has reasonable control over the mode and order of interrogating witnesses and presenting evidence. *Id.* 611(a). Considerations include the effective ascertainment of the truth, avoiding needless consumption of time, and protecting witnesses from harassment or undue embarrassment. *Id.* A trial court abuses its discretion if it unduly restricts cross-examination regarding a key issue in the case. *In re Commitment of Campbell,* No. 09–11–00407–CV, 2012 WL 2451620, at *6 (Tex. App. - Beaumont June 28, 2012, pet. denied) (mem. op.).

The extent of cross-examination for a showing of bias or credibility is within the trial court's discretion, and its decision is not subject to reversal on appeal absent a clear abuse of discretion. *Chambers v. State,* 866 S.W.2d 9, 27 (Tex. Crim. App. 1993). A defendant who exercises his right to testify is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial. *Felder v. State,* 848 S.W.2d 85, 99 (Tex. Crim. App. 1992); *Fuentes v. State,* 832 S.W.2d 635, 639–40 (Tex. App. - Houston [14th Dist.] 1992, pet. ref'd). In Texas, the scope of cross-examination is wide open, and once the defendant testifies at trial, he opens himself up to questioning by the prosecutor on any subject matter that is relevant. *Felder,* 848 S.W.2d at 99.

In the instant case, the State's questions on cross-examination were relevant to Pond's credibility, specifically, his testimony refuting that of the State's witnesses. This line of questioning was not an attempt to shift the burden of proof, but instead, tested Pond's credibility in an attempt to discover the truth.

The record shows that the trial court sustained many of defense counsel's objections but allowed Pond to answer many others. Pond has failed to show that the questions the trial court allowed were not raised by the evidence during direct examination or relevant to the issue of the case. He has also failed to establish harm, that any alleged prosecutorial error contributed to his conviction. Considering the overwhelming evidence of guilt in this case, Pond cannot establish that the alleged error contributed to his conviction.

"Declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *See Davila v. Davis,* 137 S.

Ct. 2058, 2067 (2017) (citing *Smith,* 528 U.S. at 288). In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors. *See id.* (citing 2B. Means, Postconviction Remedies 35:19, p. 627, and n.16 (2016)). Pond has failed to show that an unpreserved claim was "plainly stronger" than a preserved one. The adjudication of Pond's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the proceeding would have been different but for such errors. *Wilson v. Cockrell,* 2003 WL 21672834, at *11 (5th Cir. July 17, 2003); *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992). The state court's decision as to the effective assistance of appellate counsel reasonably applied the law to the facts, consistent with clearly established federal law. Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### B. Failing to Challenge Detective Pickering's Testimony about the National Problem of Child Sex Crimes

Detective Pickering testified for the State during the guilt innocence phase that it is overwhelming that there are thousands of child sex cases going on. The trial court overruled Pond's objections that the testimony was not relevant and that it was unfairly prejudicial pursuant to Rule of Evidence 403. Pond complains that appellate counsel's failure to raise this issue on appeal constituted deficient performance. (Docket Entry No. 1, p. 27).

The following exchange took place during the State's direct examination of Detective Pickering:

Q.     -- you worked nothing but family offenses. I mean child sex crimes cases?

A.     For the most part, that's what I was assigned.

Q.     All right. And tell the ladies and gentlemen of the jury, if you could, detective, about some of the initial steps that you would take or that you would take as a detective in working these cases?

A.     Would you like me to explain how we get the cases?

Q.     Sure.

A.     All right. Just so that everyone understands, whenever -- the way the cases actually come into us, is when you call dispatch. You make a call. Patrolman comes out.  Patrolman takes a report. The report is then sent into detectives -- to the appropriate detectives office. A supervisor assigns that case, and then it goes to each individual detective. And then you review it, and you decide what steps you need to take according to whatever case it is.

Q.     And I want to talk a few minutes, detective, about your experience in these cases throughout the course of that 14 -- 13 or 14-year period. Approximately, how many children would you interview in a given month?

A.     Would I observe being interviewed?

Q.     How many cases would you be involved in?

A.     It averages anywhere from 35 to 50 a month.

Q.   A month. So, over one a day?

A.   Average.

Q.   Okay. And are you familiar based upon your -- so, is it safe to say that if you did between 35 and 50 a month, that would be between 450 or so and 600 a year?

A.   Yes. Is that the math?

Q.   It's about as close as I can get it --

A.   Okay.

Q.   -- without getting a calculator out?

A.   All right.

Q.   All right. Now, is it safe to say that if you did between 450 and 600 cases a year, you multiply that by 10, that would be 4,500 to 6,000 and add a couple of years, you would be -- you would be over -- you've taken part or have either observed or taken part in the investigation of approximately, 4,500 cases give -- I mean, take a few hundred, a lot?

A.   It's overwhelming, isn't it?

Q.   Okay. Why is it overwhelming?

A.   Just to think of that number.

MR. JACKSON: Objection to relevance.   Objection to relevance and 403.

THE COURT: It's overruled.

MR. JACKSON: Thank you.

Q.    (BY MR. FREYER) Why is it overwhelming?

A.    To think that that many children -- that there's that much going on.

Q.    Has it been that much of a problem in the time that you have been in Montgomery County?

MR. JACKSON: Again, Your Honor. Objection to 401 and 403.

THE COURT: Okay. This is in her realm of experience. It's overruled.

MR. JACKSON: And may I ask for a running objection to this line of questioning as to the problem in Montgomery County.

THE COURT: That's fine.

4 R.R. 132-134.

Rule 702 of the Federal Rules of Evidence provides for the admissibility of expert testimony if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Additionally, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods" that the expert has "reliably applied" to the facts of the case at hand. *Id.*

The Court must first determine whether the proffered witness qualifies as an expert. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid.

702). Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact, rather than for the court. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

If the expert is qualified, then the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id.* at 589. This role requires "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("In short, expert testimony is admissible only if it is both relevant and reliable."). Although Federal Rule of Evidence 704 provides that an otherwise admissible opinion is not objectionable just because it embraces an ultimate issue to be decided by the trier of fact, that does not mean that the door is open to all opinions, and the rule is not intended to allow expert witnesses to give legal conclusions or tell the jury what result to reach. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 239-40 (5th Cir. 1983). An expert should not be permitted to give opinions that simply reiterate what the lawyers can and do offer in argument. *Little v. Technical Specialty Prods., LLC*, 940 F. Supp. 2d 460, 468 (E.D. Tex. 2013) (citing *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)). The ultimate focus remains on whether the testimony would be helpful to the trier of fact and is reliable. The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court enumerated five nonexclusive factors to consider when assessing whether the methodology upon which an expert rests his

opinion is reliable: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-94; *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The record indicates that the prosecutor provided notice to the defense that Detective Pickering would be testifying as an expert. CR 173. The prosecutor established Pickering's qualifications as an expert witness by asking her about the number of child sexual assault cases she was involved with in a month. 4 RR 133 Pond has failed to show that this testimony exceeded the realm of Detective Pickering's status as an expert witness. Pond has failed to show that this claim was stronger than the issues appellate counsel did raise.

There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the proceeding would have been different but for such errors. *Wilson v. Cockrell*, 2003 WL 21672834, at *11 (5th Cir. July 17, 2003); *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992).

The state habeas court found that: "7. This Court is familiar with the effective performance of the applicant's appellate counsel, Ms. Judith Shields, who has long practiced in

the courts of appeal for the State of Texas and is well-qualified for appointment in serious felony appellate matters." (Docket Entry No. 6-40, p. 35).

The state habeas court concluded:

> 2.    The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel, either at the time of the guilt-innocence stage or at the time of the appeal. *Strickland v. Washington,* 466 U.S. 668, 669 (1984); *Hernandez v. State,* 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

> 3.    The applicant has not overcome the presumption that his trial and appellate counsels' actions were based in sound strategy. *See Ex parte Rogers,* 369 S.W.3d 858, 862 (Tex. Crim. App. 2012).

> . . .

> 5.    The applicant has not established that if his appellate counsel were to have presented the issues he now claims should have been presented, he would have prevailed on appeal. *Ex parte Miller,* 330 S.W.3d 610, 623 (Tex. Crim. App. 2009).

*(Id.).*

The Texas Court of Criminal Appeals implicitly based its denial of habeas relief on this finding. These credibility determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Pond has not produced clear and convincing evidence to rebut these findings. The state court's decision as to the effective assistance of appellate counsel reasonably applied the law to the facts, consistent with clearly established federal law. Pond has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## VIII.   Request for an Evidentiary Hearing

Pond requests an evidentiary hearing in this case. (Docket Entry No. 22). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
> (A) the claim relies on-
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.*

The decision whether to conduct an evidentiary hearing is committed to this Court's discretion. *See Williams v. Taylor,* 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus" proceedings); *Conner v. Quarterman,* 477 F.3d 287, 293 (5th Cir. 2007)(citing *Roberts v. Dretke,* 381 F.3d 491, 497 (5th Cir. 2004) (citation omitted)); *McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir. 1998).

Where there is a factual dispute that, if resolved in the petitioner's favor, would entitle him to relief, and the State has not afforded the petitioner a full and fair hearing, a federal habeas corpus petitioner is entitled to an evidentiary hearing. *Clark v. Johnson,* 202 F.3d 760, 766 (5th Cir. 2000); *Perillo v. Johnson,* 79 F.3d 441, 444 (5th Cir. 1996). However, a petitioner is not entitled to an evidentiary hearing "if his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." *Young v. Herring,* 938 F.2d 543, 559 (5th Cir. 1991). "If it appears that an evidentiary hearing is not required, the

judge shall make such disposition of the petition as justice shall require." Rule 8 of the Rules Governing Section 2254 Cases.

This Court has been able to resolve all issues raised in this case based on the pleadings and state-court records. As already discussed, the facts and claims Pond seeks to develop lack merit. Pond has failed to provide a factual basis for granting an evidentiary hearing. This Court determines that an evidentiary hearing is not required because there are no relevant factual disputes that would require development in order to assess the claims. *Robinson v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999). Pond's motion for evidentiary hearing, (Docket Entry No. 22), is DENIED.

## IX. Conclusion

Respondent's Motion for Summary Judgment, (Docket Entry No. 13), is GRANTED. Pond's petition for a writ of habeas corpus is DENIED. This case is DISMISSED. Pond's motion for hearing, (Docket Entry No. 22), is DENIED as moot. Any remaining pending motions are DENIED as moot.

The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right. *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000)). Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further. *See Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000). Where a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. 484.

This Court denies Pond's petition after careful consideration of the merits of his constitutional claims. This Court denies a COA because Pond has not made the necessary showing for issuance. Accordingly, a certificate of appealability is DENIED.

SIGNED at Houston, Texas, on ___Sept. 24___, 2019.


VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE

O:\RAO\VDG\2013\13-1300.f01.wpd